United States Court of Appeals
Fifth Circuit

**F I L E D**

August 23, 2005

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 11, 2005

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

_____

04-10324
consolidated with
04-10834

_____

DARRELL D. MINTER, As Receiver,

Plaintiff-Counter Defendant-Appellant,

versus

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, formerly known
as American National Fire Insurance Company,

Defendant-Counter Claimant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Before KING, Chief Judge, and BARKSDALE and STEWART, Circuit
Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

In this diversity action, at issue is the summary judgment
awarded Great American Insurance Company of New York. As Receiver
for Grant Morris (judgment creditor of Jerry Lee Largent), Darrell
Minter claims Great American is liable for Morris' state court
judgment against Largent and his employer, Hammer Trucking, Inc.,
arising out of a collision between Morris and Largent's vehicles.
Largent was intoxicated at the time. Hammer Trucking had leased to
JTM Materials, Inc., the vehicle being driven by Largent, which was

used exclusively for JTM's benefit. Primarily at issue is whether Largent's intoxication at the time of the collision precludes his being a permissive user under the omnibus clause of JTM's primary commercial automobile liability policy, issued by St. Paul Fire and Marine Insurance Co., and, therefore, precludes his being an insured under the Great American excess policy. A genuine issue of material fact exists for that issue. Accordingly, we **VACATE** the judgment in favor of Great American; **REVERSE** the district court's rulings against coverage under the omnibus clause and Minter's extra-contractual tort claims; **AFFIRM** its rulings for all other coverage issues; and **REMAND** for further proceedings consistent with this opinion.

## I.

On Saturday, 9 November 1996, the tractor-trailer (the truck) driven by Largent collided with a vehicle driven by Morris, who sustained significant injuries. Largent pleaded guilty to driving while intoxicated.

The truck was owned by Largent's employer, Hammer Trucking. On 27 June 1996, approximately four months before the collision, Hammer Trucking leased the truck to JTM, a federal and state-regulated motor carrier. Under the lease, Hammer Trucking, *inter alia*: was to maintain control of the truck and use it for the exclusive benefit of JTM; had a duty to properly maintain the

2

truck; and was to bear all maintenance and operating expenses (including Largent's salary).

Originally, the truck was parked overnight at Hammer Trucking. Because Largent's wife needed their car to drive to her new job, Hammer Trucking allowed Largent to drive the truck to and from work and park it overnight at his apartment.

On the day of the collision, Largent, who lived in Bridgeport, Texas, was in the process of delivering the truck to a facility near Decatur, Texas, for scheduled maintenance (consistent with Hammer Trucking's duties under its lease with JTM). That day, Largent had been instructed by Don Hammer, Hammer Trucking's owner and president, to deliver the truck by 9:00 a.m. the next day (Sunday, 10 November). At approximately 11:00 p.m. Saturday, 9 November, Largent drove the truck to his sister's house, also located in Bridgeport, in order for her to give him a ride back from the maintenance facility in Decatur. Because his sister could not give him a ride, Largent then decided to return to his house and take the truck to the maintenance facility the next morning. The collision occurred while he was returning home.

Largent had an extensive criminal record, including convictions for DWI, reckless conduct (for which Largent was originally charged with DWI), and felony possession of methamphetamine (for which he served three years in prison); he also had five citations for driving without liability insurance.

3

*Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 51 (Tex. App.–Fort Worth 2002, no pet. h.). When Hammer Trucking entered into its lease agreement with JTM several months before the collision, JTM's safety director conducted a background check on Largent, consisting of an "AMS Driver Report for Texas"; that background check, however, covered only the three years preceding 12 September 1996 and did not reveal Largent's previous offenses for DWI, reckless conduct, methamphetamine possession, or any of his citations for driving without liability insurance. *Id.* It appears that this report and a drug screening test were the extent of JTM's investigation to qualify Largent as a truck driver. On the other hand, a driving report from the Texas Department of Public Safety would have revealed the full extent of Largent's driving and criminal record. *Id.*

JTM's primary commercial automobile liability insurance policy was issued by St. Paul; its excess policy, by Great American. The St. Paul policy has a $1 million coverage limit for each accident caused by a covered automobile; Great American's excess coverage became effective upon that limit's being exhausted.

In May 1997, in Texas state court, Morris filed an action against Largent, Hammer Trucking, and (by an amended petition) JTM, claiming, *inter alia*: (1) negligence and negligence *per se* by Largent; (2) negligent hiring, retention, and supervision of Largent, negligent entrustment, and vicarious liability against

4

Hammer Trucking and JTM based on *respondent superior*; (3) joint enterprise, joint venture, and civil conspiracy against JTM; and (4) Largent's being JTM's statutory, actual, constructive, or borrowed employee, and JTM's being liable under the Federal Motor Carrier Safety Regulations. The claims against JTM were severed from those against Largent and Hammer Trucking.

Upon JTM's being added as a defendant, it notified AON Risk Services of Texas, Inc. AON was Great American's agent, *inter alia*, for "all usual and customary services of an insurance agent". In September 1998, AON forwarded a copy of Morris' first amended petition and a corresponding summons to St. Paul; however, AON did *not* forward notice of Morris' action to Great American. St. Paul provided JTM a defense against Morris' claims but did *not* do so for Hammer Trucking or Largent.

JTM was awarded summary judgment shortly before the claims against Largent and Hammer Trucking were tried. For their jury trial in August 2000, Largent and Hammer Trucking proceeded *pro se*. During trial, Morris was awarded a directed verdict on liability, with the court ruling: at the time of the accident, Largent was acting *within the scope of his employment* with Hammer Trucking and was a *permissive user* of the truck. The following questions were submitted to the jury: (1) the amount of Morris' compensatory damages; (2) whether Largent and Hammer Trucking acted with malice; and (3) if so, the amount of exemplary damages. The jury awarded

5

damages jointly and severally against Hammer Trucking and Largent for approximately $2.6 million, with very substantial pre- and post-judgment interest; it also found they had acted with malice and assessed exemplary damages of $1,650,000 against Largent and $300,000 against Hammer Trucking.

The judgment against Largent and Hammer Trucking was *not* appealed. As for the summary judgment awarded JTM, the Fort Worth court of appeals: (1) vacated that judgment for part of the vicarious liability claims and for the claims for negligent hiring, retention, supervision, and entrustment, and remanded for trial on those issues, *Morris*, 78 S.W.3d at 43, 52-53; and (2) affirmed for *respondeat superior*, civil conspiracy, joint venture and joint enterprise, *id.* at 57. In vacating the summary judgment awarded JTM for part of Morris' vicarious liability claims, the court held: if JTM was a federally regulated motor carrier, it was liable, as a matter of law, under the Federal Motor Carrier Safety Regulations. *Id.* at 43. Importantly, in affirming JTM's summary judgment against Morris' *respondeat superior* claim, the court held: Largent was *acting outside the scope of his employment* at the time of the collision. *Id.* at 48. (The record is silent concerning the disposition of this matter on remand.)

In May 2001 (prior to the decision rendered in 2002 by the Fort Worth court of appeals for the claims against JTM), in order to satisfy Morris' judgment against Largent, the state court

6

ordered Largent to turn over assets to Minter, who had been appointed Receiver. Those assets included Largent's claims against St. Paul and Great American that they: (1) failed to provide a defense; (2) failed to indemnify under their policies issued to JTM; (3) acted in bad faith; (4) engaged in unfair insurance practices, in violation of TEX. INS. CODE ANN. art. 21.21 (Vernon 1981 & Supp. 2004-2005); and (5) violated the Texas Deceptive Trade Practices Act, *see* TEX. BUS. & COM. CODE ANN. §§ 17.46, 17.50 (Vernon 2002 & Supp. 2004-2005).

Minter filed a state court action against St. Paul, which settled for $1.9 million (including all claims against JTM and Hammer Trucking). (The $1 million coverage limit for JTM's policy was reached; apparently, the additional $900,000 was for settlement of extra-contractual tort claims.)

In September 2002, Minter filed this diversity action against Great American, seeking recovery of that part of Morris' state court judgment against Largent which had not been satisfied by the settlement with St. Paul. Great American filed a third-party action against AON for breach of contract and tort claims for failure to give timely notice of Morris' action. Great American and Minter moved for summary judgment.

The district court awarded summary judgment to Great American, holding: (1) based on the ruling of the Fort Worth court of appeals concerning the summary judgment that had been awarded JTM,

7

*Minter was collaterally estopped* from claiming Largent was acting *within the scope of his employment* at the time of the collision; (2) *Great American was not collaterally estopped* from contending Largent was *not a permissive user* of the truck, despite the contrary state court judgment, because the issue had not been "vigorously litigated" in state court; (3) concerning permission *vel non*, Largent's intoxication took his use of the truck outside the scope of permission granted by Hammer Trucking or JTM; (4) coverage did not exist under either the TE 9916 endorsement to, or the "exclusive use" clause of, the St. Paul policy because Largent had no ownership interest in the truck; (5) coverage did not exist under the MCS-90 endorsement to the St. Paul policy because that provision acts as an independent basis for coverage only when other coverage is lacking; (6) accordingly, no coverage existed under the underlying St. Paul policy, and, therefore, none existed under the Great American excess policy; and (7) there being no coverage under the Great American policy, Minter's extra-contractual tort claims failed as a matter of law. *Minter v. Great Am. Ins. Co.*, No. 3:02-CV-2040-K, 2004 WL 515615 (N.D. Tex. 27 Feb. 2004) (unpublished).

## II.

Reviewed *de novo*, *e.g.*, *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001), a summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

8

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". FED. R. CIV. P. 56(c).

"An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citation omitted). A fact-issue is material only if its resolution could affect the action's outcome. *E.g.*, *St. David's Health Care Sys. v. United States*, 349 F.3d 232, 234 (5th Cir. 2003).

The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant. *E.g.*, *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994). (Along that line, portions of the state trial transcript are in the summary judgment record.) Interpretation of an unambiguous insurance contract is a question of law. *E.g.*, *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998). It is undisputed that Texas law applies.

A.

Section II.B of the Great American excess policy defines an "Insured" as, *inter alia*:

> (1) Your [JTM's] employees, other than your executive officers, *but only for acts within the scope of their employment* .... (5) Any other person or organization who is *insured under any policy of 'Underlying Insurance.'*

9

> The coverage afforded such 'Insureds' under this policy *will be no broader than* the 'Underlying Insurance' except for this policy's Limit of Insurance.

(Emphasis added.)   The St. Paul policy was listed in the Great American policy's schedule of underlying policies.

Concerning part (1) for this definition of "insured" (JTM's employee acting within scope of employment), Minter claims JTM (and, therefore, Great American) is liable because Largent was JTM's "statutory employee" under the Federal Motor Carrier Safety Regulations (FMCSR).  *See* 49 C.F.R. § 383.5.   As noted, the Fort Worth court of appeals held:  "*if JTM is an interstate carrier*, [JTM] is vicariously liable as a matter of law for Largent's negligence".  **Morris**, 78 S.W.3d at 43 (emphasis added).   Great American contests JTM's being an interstate carrier and therefore subject to the FMCSR.   In any event, assuming *JTM* is both an interstate carrier and, therefore, vicariously liable for Largent's negligence, Minter must still establish Largent was an "insured" to recover against *Great American*.   Cf. **Radman v. Jones Motor Co., Inc.**, 914 F. Supp. 1193, 1198 (W.D. Pa. 1996) ("The simple fact of the matter is that Congress intended that ... the ICC carrier[] be the insurer of [its leased tractor trailer drivers] with respect to the general public.") (emphasis deleted).

To that end, Minter claims Largent was acting within the scope of his employment with JTM at the time of the collision.   Minter does not contend, much less demonstrate, that the district court

10

erred in ruling Minter is collaterally estopped from making this scope-of-employment claim; accordingly, he is precluded from asserting scope of employment here. As a result, Minter cannot show scope-of-employment coverage under the Great American policy.

Consequently, coverage exists under that policy only if, pursuant to part (5) for the above definition of "insured", coverage is established under the underlying St. Paul policy. For doing so, Minter maintains coverage exists under four of that policy's provisions: (1) the omnibus/permissive-user clause (coverage for anyone using a "covered auto" with JTM's permission); (2) the MCS-90 endorsement (establishing liability for federally regulated motor carriers for injuries sustained by general public, where no other coverage exists); (3) the exclusive use clause (coverage for owner of a covered auto from whom JTM hires or borrows a "covered auto" that is used exclusively in JTM's trucking business); and (4) the TE 99-16 endorsement (coverage for owner of "covered auto" which JTM rents or leases). "[C]onstruction of insurance policies is a matter of state law". *Canal Ins. Co. v. First Gen. Ins. Co.*, 889 F.2d 604, 608 (5th Cir. 1989), *modified by* 901 F.2d 45 (5th Cir. 1990). Both parties assume that Texas law applies; we do as well. For the following reasons, the summary judgment awarded Great American against each of these four claims is vacated for the omnibus clause but affirmed for the other three.

11

1.

JTM's underlying St. Paul policy defines an "Insured" as, *inter alia*, "[a]nyone ... using with [JTM's] *permission* a covered auto you own, hire, or borrow ...." (Emphasis added.) This permissive-user clause is commonly known as an "omnibus clause". *See* BLACK'S LAW DICTIONARY 1121 (8th ed. 2004) (defining "omnibus clause" as "[a] provision in an automobile insurance policy that extends coverage to all drivers operating the insured vehicle with the owner's permission"). Great American does not contest the truck's being a "covered auto" under the St. Paul policy. Therefore, at issue is whether, at the time of the collision, Largent was using it with JTM's permission.

As noted, although the state trial court held Largent was acting within the scope of permission, the district court held that, because this issue was not vigorously litigated in state court, *see **Mower v. Boyer***, 811 S.W.2d 560, 562 (Tex. 1991), Great American was not collaterally estopped from re-litigating it. Minter does *not* properly contest, much less demonstrate error in, this holding; therefore, we will consider this permission issue.

In Texas, permission is defined as "*consent to use* the vehicle at the time and place in question and *in a manner authorized* by the owner, either *express or implied*". ***Hartford Accident & Indem. Corp. v. Lowery***, 490 S.W.2d 935, 937 (Tex. Civ. App.–Beaumont 1973, writ ref'd n.r.e.) (citation omitted; emphasis added). Although

12

express permission requires an affirmative statement, "implied permission may be inferred from a course of conduct or relationship between the parties in which there is mutual acquiescence or lack of objection signifying consent". *Royal Indem. Co. v. H.E. Abbott & Sons, Inc.*, 399 S.W.2d 343, 345 (Tex. 1966).

Pursuant to its lease with JTM, Hammer Trucking had sole responsibility for maintaining the truck. And, it is undisputed that, on the night of the collision, Largent had express permission from Don Hammer to drive the truck to the maintenance facility. In awarding summary judgment to Great American, the district court ruled: "Driving to [Largent's] sister's house was outside the scope of the permission expressly granted to [him], as he was only given express permission to take the truck to the maintenance yard". *Minter*, 2004 WL 515615, at *6. At the state court trial, however, Don Hammer testified that he gave Largent permission to go to his sister's house to secure a ride back from the maintenance yard.

Great American contends: Largent's proceeding to his sister's house was a "personal errand"; Hammer Trucking and JTM had told Largent the truck was *not* to be used for personal errands; and, therefore, Largent's truck-use was outside the scope of the express permission. Given that Largent asserted he had express permission to seek a ride from his sister, and there is competent summary judgment evidence in support, a material fact issue exists for

13

whether Largent had *express permission* to drive the truck to his sister's house.  The district court erred in holding otherwise.

Even assuming Largent did not have such express permission, it can be reasonably inferred that Hammer Trucking expected Largent to arrange his return transportation from the maintenance facility in Decatur.  Don Hammer knew that Largent's wife used their only car to commute to her job at night.  This was why Hammer allowed Largent to keep the truck at his apartment – because he had no other regular transportation to and from work.  This arrangement between Hammer Trucking and Largent suggests "a course of conduct ... between the parties in which there is mutual acquiescence ... signifying consent".  ***Royal Indem. Co.***, 399 S.W.2d at 345.  Therefore, a material fact issue also exists for whether Largent had *implied permission* to drive to his sister's house, which was approximately one mile from his apartment, in order to arrange his return transportation from Decatur.

These genuine issues of material fact, however, do not compel vacating the summary judgment awarded Great American against the omnibus-clause issue.  Even if Largent had express or implied permission to drive to his sister's house, another issue is whether his intoxication placed his use of the truck outside the scope of that permission (part of the "manner authorized").  Texas follows the "minor deviation" rule in determining whether a vehicle's use is outside the scope of permission.  *See* ***Coronado v. Employers'***

14

*Nat'l Ins. Co.*, 596 S.W.2d 502, 504-05 (Tex. 1979). "Under this rule, the court must determine in each instance[,] taking into account the extent of deviation in actual distance or time, the purposes for which the vehicle was given, *and other factors*[,] whether the deviation was 'minor' or 'material.'" *Id.* at 504 (emphasis added).

Some deviations may be *so minor* that they *do not create a fact issue* whether permission was revoked; other, *more significant* deviations *may create such an issue*; and some deviations may be *so material* that they revoke permission *as a matter of law*. *Id.* at 506. Along this line, the district court ruled:

> Had Largent only driven the truck to his sister's house, the deviation might have been minor, as the trip was allegedly related to his bringing the truck in for maintenance at Hammer's request. However, Largent's operation of the truck while intoxicated was so far outside of the express permission granted to him by JTM and Hammer that his *deviation was material as a matter of law*.

*Minter*, 2004 WL 515615, at *7 (citation omitted; emphasis added).

Great American contends the summary judgment record establishes: JTM had a "zero tolerance" policy regarding alcohol use by its drivers, which it communicated to Largent in the form of a drug and alcohol handbook; and Don Hammer expressly instructed Largent that he was *not* to operate the truck after drinking alcohol. Minter counters by noting that, in state court, JTM admitted it had no safety policies or procedures for leased trucks

15

such as Hammer's or for independent contractors, i.e., leased drivers. The district court assumed *JTM* had expressly forbidden Largent from operating the truck under the influence of alcohol, despite Minter's having presented summary judgment evidence to the contrary. *Id.* at *6.

The summary judgment record shows Don Hammer instructed Largent to deliver the truck for scheduled maintenance before 9:00 a.m. on Sunday, 10 November 1996. Don Hammer had anticipated delivery would probably take place the prior evening (Saturday). Moreover, as previously stated, there is a material fact issue whether Largent had express or implied permission to drive to his sister's house to arrange return transportation. As stated, we will assume Largent (the nonmovant) did have permission. Therefore, for summary judgment purposes, we must determine whether Largent's intoxication was a deviation *so material* that, *as a matter of law*, the permission was revoked.

In **Coronado**, the employee/driver left work at approximately 4:15 p.m. with his work crew but, instead of taking them home, took them to a local bar to drink beer. 596 S.W.2d at 503. They stayed three to four hours, then proceeded to another bar "some distance" away. *Id.* Upon leaving the second bar after midnight, the driver was involved in an accident, causing a passenger's death. *Id.* The resulting wrongful death action claimed the driver was a permissive

16

user under the omnibus clause in the employer's automobile liability policy. *Id.* at 504.

The Texas Supreme Court phrased the issue as follows: "whether an employee who was driving a company owned vehicle *on a purely personal mission* after working hours" was covered under that clause. *Id.* at 503 (emphasis added). The court rejected plaintiff's contention that, based on a supervisor's having twice found the employee *drinking beer shortly after work, while still using the truck*, the employee had *implied permission to drive while intoxicated*. *Id.* at 505. The court held:

> [T]he *eight hour deviation* [at issue] ... was so gross as to be a *material deviation as a matter of law*. The *use of the vehicle at the time* of the accident was so far outside the scope of the permission granted ... for use of the vehicle that we cannot say that a fact issue is raised that his employer had impliedly consented to this use.

*Id.* at 506 (emphasis added). The court viewed intoxication as an "other factor", as opposed to a primary consideration, in determining whether the deviation was material as a matter of law.

A similar omnibus-clause issue arose in *Old Am. County Mut. Fire Ins. Co. v. Renfrow*, 130 S.W.3d 70 (Tex. 2004) (*per curiam*). An employee, who had permission only to drive the company truck home after work and to return to the job site the next morning, drove it to visit his girlfriend approximately 40 miles away in Saginaw, Texas. *Id.* at 71-72. Upon returning, the girlfriend was

17

killed in a single-vehicle accident.  Plaintiffs offered evidence that the employee commonly drove the company truck to his girlfriend's house and to his foreman's house *to drink beer*, ***id.*** at 72, and claimed this established implied permission to use the company truck for personal errands.  The court held:  as a matter of law, the trip to Saginaw was a *material deviation*, because it was so far removed from the geographic area in which the employee had permission to drive.  ***Id.*** at 73.

In ***Royal Indemnity***, Herring employed Landers to work on his ranch.  399 S.W.2d at 344.  Landers lived there and had permission to drive two work-trucks to perform his duties.  ***Id.***  One weekend, Herring and Landers drove to the horse races in Bronte, Texas; on returning that afternoon, *each drank two bottles of beer*.  ***Id.*** at 344-45.  That evening, while Herring was away, Landers drove one of the work-trucks to San Angelo, Texas (approximately 50 miles away), on a personal errand; he *bought and drank more beer on the way* and, eventually, lost control of the vehicle and ran into a building.  ***Id.*** at 345.  A jury found:  at the time of the accident, Landers was driving the truck within the scope of implied permission from Herring; and, therefore, coverage existed under the omnibus clause of Herring's automobile policy.  ***Id.*** at 343.  In reversing, the Texas Supreme Court held:

> [T]he evidence shows *neither a relationship nor a prior course of conduct from which implied permission might fairly be inferred*.

18

> Landers was employed as a ranch hand. He had never driven one of the vehicles off the ranch except when specifically instructed to do so, and had never used any of them for a personal errand. His employer had always driven him to town whenever he wanted to go, and had no reason to believe that he intended or might need to use one of the vehicles on the evening of the accident. In view of these undisputed facts, the limited privileges Landers was allowed in the Herring house, his occasional pleasure trips with Herring, the availability of the vehicles, his use of the same on the ranch, ... and the absence of any prior instruction not to take the vehicles off the ranch, afford *no basis* for concluding that Landers had implied permission to use the truck for a trip to San Angelo *on a personal mission*.

*Id.* at 347 (emphasis added).

In these cases, the critical inquiry cited by the court was the deviation in actual distance or time from the original permission granted. Intoxication was *not* mentioned by the **Royal Indemnity** court in finding permission lacking as a matter of law, despite the uncontested fact that the employee/driver had consumed several alcoholic beverages immediately prior to driving into a building. Obviously, intoxication is an "other factor" to consider for whether a deviation is material. *See **Coronado***, 596 S.W.2d at 504*. Indeed, it was a factor considered by the **Coronado** court in holding the deviation material as a matter of law. *Great American has cited no Texas case law, however, holding that intoxication per se revokes permission*. Instead, it is an "other factor" to be considered in determining the extent of the deviation.

19

In the light of Largent's driving record's containing a history of alcohol offenses, as well as a drug felony, JTM's failure to request that driving record from the Texas Department of Public Safety, Largent's being instructed by Don Hammer not to drink and drive, and its being disputed whether JTM informed Largent of its "zero tolerance" policy, a genuine issue of material fact exists for whether Largent's intoxication placed his use of the truck outside the scope of permission. This situation is distinguishable from *Coronado*, *Renfrow*, and *Royal Indemnity*, because Largent was *not* engaged in a purely personal errand at the time of the accident. Moreover, those cases involved significant geographical and time deviations from the scope of permission granted to operate the vehicles. Even if the drive to Largent's sister's house was a deviation, it was certainly not as significant geographically or time-wise as those in *Coronado*, *Renfrow,* and *Royal Indemnity*.

Based on the summary judgment record, it appears that JTM and Don Hammer did not exercise reasonable care in investigating Largent's background, and there is no evidence that either had knowledge of Largent's propensities toward operating a motor vehicle while intoxicated. Nevertheless, the lack of evidence on this point is not determinative. In the light of the summary judgment record, and as contended by Minter, a jury could find that Largent's use of the truck was within the scope of permission

20

granted by Don Hammer.  Similarly, a jury could find Largent's intoxication revoked permission.  For example, a genuine issue of material fact exists for whether Don Hammer's instruction not to drink and drive, *without more*, caused Largent's driving while intoxicated to be outside the scope of permission.  Obviously, to hold Largent's violating this instruction, alone, is a material deviation that, as a matter of law, places his driving outside the scope of permission, would be well beyond any Texas state law precedent.  In any event, on this summary judgment record, genuine issues of material fact preclude reaching that ***Erie***-question.

2.

The MCS-90 motor carrier endorsement for the underlying St. Paul policy states in relevant part:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy ....
> It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of

21

> the financial condition, insolvency or bankruptcy of the insured.

This endorsement must accompany "any liability policy issued to a registered motor carrier pursuant to 49 U.S.C. §§ 13906(a)(1), 31139(b)(2) and 49 C.F.R. § 387". *T.H.E Ins. Co. v. Larson Intermodal Servs., Inc.*, 242 F.3d 667, 670 (5th Cir. 2001). Essentially, "the MCS-90 [endorsement] makes the insurer liable to third parties for any liability resulting from the negligent use of any motor vehicle by the insured, even if the vehicle is not covered under the insurance policy". *Id.* at 671. Interpretation of this endorsement is governed by federal law. *See Canal Ins.*, 889 F.2d at 610.

Minter claims this endorsement enlarges broadly the definition of an insured under the St. Paul policy and that the public policy rationale underpinning the MCS-90 endorsement is present here: ensuring a registered motor carrier has an independent financial responsibility to pay for losses sustained by the general public that arise from its trucking operations. *See id.* at 611; *Travelers Ins. Co. v. Transp. Ins. Co.*, 787 F.2d 1133, 1140 (7th Cir. 1986).

Great American counters: the endorsement is not applicable because it is *not* attached to the Great American policy; the coverage limit under the St. Paul primary insurance, to which the endorsement was attached, has been exhausted; and the public policy rationale cited by Minter is *not* present precisely because Morris

22

received the maximum amount of coverage under the St. Paul policy ($1 million).

The MCS-90 endorsement is, "in effect, suretyship by the insurance carrier to protect the public – a safety net". *T.H.E Ins.*, 242 F.3d at 672 (quoting *Canal Ins. Co. v. Carolina Cas. Ins. Co.*, 59 F.3d 281, 283 (1st Cir. 1995)). Thus, an insurer's responsibilities under the endorsement are triggered when the policy to which it is attached does not provide coverage to the insured. *Id.* As stated, the St. Paul policy not only provided coverage but provided the maximum amount under the policy. Because the St. Paul policy exhausted its coverage limit, coverage does not exist under the MCS-90 endorsement; therefore, this endorsement does not provide coverage under the Great American policy. *See id.* at 672 ("[T]he insurer's obligations under the MCS-90 are triggered [only] when the policy to which it is attached provides no coverage to the insured.").

3.

The next claimed coverage is under the St. Paul policy's "exclusive use" clause. An "insured" is "[t]he owner or anyone else from whom *you [JTM] hire or borrow* a covered auto ... while [it]: (1) [i]s being used exclusively in your business as a trucker; and (2) [i]s being used pursuant to operating rights granted to you by a public authority". (Emphasis added.)

Minter is acting as Receiver for claims by Largent, *not* Hammer Trucking, against Great American; for coverage under this clause, Minter must establish that *Largent* was the owner or person from whom JTM hired or borrowed the truck. Minter contends: because Largent had sole custody of the truck at his home, JTM was essentially borrowing the truck from him when he performed JTM's maintenance duties. Needless to say, this contention is wholly without merit.

The lease governing the truck's use lists Hammer Trucking, *not* Largent, as the "Owner-Operator Lessor". Largent's name does *not* appear in the lease. Hammer Trucking allowed Largent to keep the truck at his residence simply as an accommodation for Largent's lack of transportation to and from work. There is no evidence in the record that Hammer Trucking intended to convey any ownership interest to Largent.

4.

Finally, in one paragraph of its brief, Minter claims coverage under the TE 99-16 endorsement to the underlying St. Paul policy. That endorsement modifies the definition of "covered auto" to include any automobile JTM hired, borrowed or leased. It also states: "While any covered auto ... is rented or leased to [JTM] and *is being used by [JTM] or for [JTM], its owner or anyone else from whom [JTM] rent[s] or lease[s]* it is an insured ...." (Emphasis added.)

24

As with the "exclusive use" clause, Minter must establish it was Largent, *not* Hammer Trucking, from whom JTM rented or leased the truck. As he did for that clause, Minter contends that, because the truck was a leased vehicle being used by Largent to perform JTM's non-delegable duty of maintenance, coverage exists under this endorsement.

As discussed above, however, there is no evidence that Largent had any ownership interest in the truck. That Largent's use of the truck at the time of the accident may have been related to JTM's non-delegable duty of maintenance is immaterial in deciding coverage *vel non* under this endorsement. Some form of ownership interest is required for coverage under this endorsement.

B.

For Largent's claims, and based on the foregoing, the only possible coverage is under the St. Paul policy as a permissive user. Great American maintains that, even if Minter can satisfy that standard, it is *not* liable for the state court judgment for any one of three reasons: (1) it did not receive notice of the state court action until after entry of judgment; (2) that action did not involve an "actual trial"; and (3) there was no "occurrence" within the meaning of the policy. After having raised these affirmative defenses in its answer to plaintiff's first amended complaint, *see* FED. R. CIV. P. 12(b), Great American raised them in its summary judgment motion. It was not necessary for the

25

district court to address them because it held coverage did not exist.

1.

Concerning its not receiving notice of the state court action until eight months after entry of judgment, Great American does not dispute that AON, its agent, received notice of Morris' action. Great American maintains, however: AON accepted loss-notice provisions on behalf of JTM, the *insured*, not Great American, the *insurer*; and, therefore, AON's receipt of notice was insufficient to constitute constructive notice to Great American. Moreover, Great American contends the agency agreement provided no authority for AON to accept loss notices on behalf of Great American.

The agency agreement granted AON authority to act as Great American's agent to: "(a) issue and deliver policies, bonds, certificates, endorsements and binders; (b) cancel policies and obligations; and (c) provide all usual and customary services of an insurance agent on all contracts of insurance ...", as well as accept premiums on behalf of Great American. At the time of the collision, and during the original state court proceeding, Texas had two classifications for insurance agents: "local recording agents" and "solicitors". *See* TEX. INS. CODE ANN. art. 21.14 (Vernon 1981), *amended by* Acts 2001, 77th Leg., ch. 703, § 3.01, eff. 1 Sept. 2001. A "local recording agent" was defined as one who "solicits insurance, has the power to write policies of insurance,

26

binds the insurer on risks, and collects premiums on behalf of the insurer". ***TIG Ins. Co. v. Sedgwick James***, 276 F.3d 754, 760 (5th Cir. 2002) (citing TEX. INS. CODE ANN. art. 21.14 (Vernon Supp. 2001)). Under the terms of the agency agreement, AON was Great American's "local recording agent". Minter asserts several times that AON held that position; Great American never disputes this.

A "recording agent is closest to the principal, and his actions will always bind the principal". ***Id.*** (citation omitted). Great American does not dispute AON had previously forwarded several of JTM's loss notices to it. Moreover, both counsel for Great American and an officer at AON (a licensed "local recording agent") admitted it is customary for an insurance agent to receive, on behalf of its principal, notice of lawsuits. Therefore, AON had both actual and apparent authority to accept loss notices on behalf of Great American.

It is a fundamental rule of agency law that notice to the agent constitutes notice to the principal. *See*, *e.g.*, ***Elite Towing, Inc. v. LSI Fin. Group***, 985 S.W.2d 635, 642–43 (Tex. App.–Austin 1999, no pet. h.). Accordingly, Great American's lack-of-notice defense fails as a matter of law.

2.

Great American cites three Texas Supreme Court decisions for the proposition that the underlying judgment arising out of Morris' state court action is unenforceable because it did not result from

an "actual trial". *See State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38 (Tex. 1998); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819 (Tex. 1997); *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996). In *Maldonado*, the defendant did not appear for trial; his lawyer neither contested the plaintiff's evidence of liability and damages nor cross-examined any witnesses. 963 S.W.2d at 40. Similarly, in *Cowan,* the defendant in the underlying trial did not appear or present any defense. 945 S.W.2d at 821. Moreover, that case was decided on other grounds. *Id. Gandy* involved a

> settlement arrangement between the plaintiff and some of the defendants ... by which the settling defendants agree[d] to pay the plaintiff a certain amount of money and to participate in the trial against the nonsettling defendants, and the plaintiff agree[d] to release the settling defendants from liability and, if the judgment against a nonsettling defendant [was] large enough, to repay the settlement amount.

925 S.W.2d at 709 (citation omitted). These types of agreements were held void as a matter of public policy. *Id.* at 710.

Great American maintains this action is similar to *Maldonado* and *Cowan* because Largent failed to: answer discovery requests; respond to Morris' motion for partial summary judgment on liability; participate in the pretrial hearing; participate in jury selection; make an opening statement; cross-examine any of Morris' witnesses or object to his evidence; call witnesses or otherwise

28

introduce any evidence in his defense; or make a closing argument. Therefore, according to Great American, the underlying state trial was not an "actual trial" because liability and damages were not "vigorously litigated".

First, all three decisions are factually distinguishable from the situation at hand. Unlike **Gandy**, there is no evidence of collusion between the plaintiff and defendants. Moreover, this case is not similar to either **Maldonado** or **Cowan** because Don Hammer, *pro se*, defended himself and Largent, his co-defendant.

In any event, and for the reasons given *supra*, Great American had constructive notice of the action against JTM, Hammer Trucking, and Largent. In **Ridgway v. Gulf Life Ins. Co.**, 578 F.2d 1026 (5th Cir. 1978) (*per curiam*), an excess carrier had notice of an action against its insured, yet failed to provide a defense. In a subsequent action by the insurer to collaterally attack the judgment against its insured, our court adopted the following from the district court's opinion: "The principle is well-established that if a liability insurer with notice of a suit and duty to defend it fails to do so, it is bound by the judgment in that suit". **Id.** at 1029. Moreover, our court ruled that it made no difference whether an insurer had the duty to defend or the right to defend; it was sufficient that the insurer had "the right to defend and had adequate notice of a claim under the terms of this policy". **Id.** We hold similarly that, because Great American had

29

constructive notice of the underlying action against JTM, Largent, and Hammer Trucking, as well as the right to defend, it is precluded from collaterally attacking the state court judgment.

3.

Finally, Great American contends that, because the state court jury found Largent acted with malice, there was no "occurrence" under its policy. There, "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions which occur during the policy period which *unexpectedly* and *unintentionally* results in 'injury'". (Emphasis added.) A finding of malice in Texas requires, *inter alia*, that "the actor has actual, subjective awareness of the risk involved ...." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7)(B)(ii) (Vernon 1997), *amended by* Acts 2003, 78th Leg., ch. 204, § 13.02, eff. 1 Sept. 2003. Great American claims Largent's collision with Morris could not have been an "accident" because Largent was aware of the risk of driving while intoxicated.

*Cowan*, the one case cited by Great American, is easily distinguishable. There, a photo lab technician intentionally copied revealing photographs of Cowan and showed them to a friend, who also knew Cowan. 945 S.W.2d at 820-21. The court held that, because copying the photographs was intentional, it was *not* an "occurrence" under the policy. *Id.* at 827-28.

Obviously, *Cowan* did not concern a commercial automobile liability policy. Moreover, it dealt with an intentional act.

30

There has been no allegation that Largent *intentionally* caused the collision with Morris.  Absent authority on point, we decline to hold that intoxication results in "no occurrence" under a commercial motor liability policy.  (During oral argument, Great American admitted such a holding would be "a red letter day" in Texas insurance law.)

C.

As noted, in addition to breach of contract, Minter presented tort claims for bad faith, malice, and violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act. Concomitant to its holding coverage did not exist under either the St. Paul or Great American policies, the district court held these claims failed as a matter of law.  *Minter*, 2004 WL 515615, at *10. Because material fact issues preclude finding no coverage under the underlying St. Paul omnibus clause, we reverse these rulings against Minter's tort claims.

III.

In sum, any recovery by Minter against Great American's excess policy must have its basis in the omnibus clause for the underlying St. Paul policy; genuine issues of material fact exist for whether Largent was a permissive user under that clause.  On the other hand, Minter has failed to establish coverage under the "exclusive use" clause or the MCS-90 or TE 99-16 endorsements to that policy. Great American's affirmative defenses fail as a matter of law. Summary judgment against Minter's extra-contractual tort claims is

31

vacated.  Accordingly, the judgment in favor of Great American is **VACATED**; the underlying rulings in favor of Great American are **AFFIRMED in PART** and **REVERSED in PART**; and this matter is **REMANDED** for further proceedings consistent with this opinion.

*VACATED; AFFIRMED IN PART and REVERSED IN PART; REMANDED*