# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 2, 2010

No. 08-20296

Charles R. Fulbruge III
Clerk

STEPHEN GILBERT,

Plaintiff-Appellant,

v.

STEVEN FRENCH, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:06-CV-3986

Before GARWOOD, WIENER, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Stephen Gilbert appeals the district court's grant of summary judgment in favor of the Defendant-Appellees for Gilbert's 42 U.S.C. § 1983 claims, arising from acts Gilbert contends constituted excessive force and a failure to intervene, in violation of his constitutional rights. Finding no error in the district court's grant of judgment in favor of the Defendant-Appellees, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 08-20296

## I.    BACKGROUND

Summary judgment proof establishes that on December 19, 2004, at approximately 9:30 p.m., Gilbert and another man, Michael Hall, entered a Taqueria Arandas restaurant in Bryan, Texas. Gilbert and Hall were both wearing masks over their faces; Gilbert was armed with a piece of pipe and Hall was carrying a gun. Upon entering the restaurant, Gilbert and Hall assaulted and restrained four of the five employees in the building. Hall used the back of his gun to beat one employee, Edmundo Cruz, who almost bled to death as a result of his resulting head injury and cracked skull. While the fifth employee exited the building to call the police, Gilbert and Hall demanded money from and robbed the other four employees at gunpoint. The four employees were placed in one of the restaurant's food storage rooms, and Hall removed Santo Domingo Reyes from the room to use as a hostage. The three employees remaining in the storage room reported hearing the sounds of a beating, but the record is unclear as to what injuries Reyes may have suffered prior to exiting the restaurant. Cruz and the other two employees left in the storage room eventually escaped through the front door, completely oblivious to what events subsequently took place behind the restaurant.

Soon after the fifth employee had run across Texas Avenue to call the police, numerous police units arrived on the scene and began to circle the restaurant. While strategically positioning themselves, the police learned that a dispatcher had just heard, over an open telephone line to the restaurant, a male stating: "If he does not get any money, somebody is going to die." At this same time, one police officer observed a masked man armed with a gun through one of the restaurant's windows.

2

No. 08-20296

After Officers French, Oliver, Bona, Pottinger, and Swartzlander positioned themselves near the back door of the restaurant, Hall, still masked, opened and looked out of the back door of the restaurant. The police announced themselves and ordered Hall to surrender, but he refused and instead went back into the restaurant. A few minutes later, the door opened again and this time three men—Gilbert, Hall, and a hostage (Reyes)—exited. Reyes was bleeding from his left arm and was being used by Gilbert and Hall as a shield between them and the police.

Although the police ordered Gilbert and Hall to show their hands and get down on the ground, neither complied. Instead, Hall shoved the hostage towards the police, revealing a large black handgun pointed at the officers. Officer French reported he was the first to see the gun in Hall's hand, and that he began to fire first.[1] After the officers began to shoot at Hall, both Hall and Gilbert took off running. French claims that both Officers Hauke and Oliver also fired at Hall.[2] Officer Oliver indicated that he shot at Hall three times. French reported that he fired three rounds at Hall as Hall attempted to flee. Hall ultimately died from the injuries he sustained in his attempt to flee.

The record establishes that three officers shot at Gilbert: Officer Hines, Officer Harrison, and Officer Schooler. Hines and Harrison were stationed on

---

[1] Officer Swartzlander's police report, however, indicates that he, or his dog, may have been the first to notice the weapon Hall was carrying. In his report, Swartzlander stated that as soon as Hall shoved Reyes to the ground, his dog saw Hall's pistol and immediately leaped, in an attempt to attack Hall. Because Swartzlander was attached by a leash to the trained dog, the dog's sudden leaping caused Swartzlander to fall to the ground. Consequently, Swartzlander watched from the ground as Hall aimed his weapon at Oliver and French.

[2] Although Hauke was not stationed directly behind the restaurant, and thus never saw the bloody hostage, Hauke reported that he shot four rounds at Hall as Hall attempted to flee the scene.

No. 08-20296

the opposite (front side) of the restaurant, behind a car they were using for protection. Officer Schooler was positioned with Officer Amaya (who did not shoot at Gilbert)– and they were hiding behind another car. The evidence does not establish whether it was Hines's, Harrison's, or Schooler's shots that actually hit Gilbert (he sustained two gunshot wounds).[3]  Gilbert, in his complaint, various pleadings, and now in his brief before this court, maintains that he was running away with his arms raised, in an apparent attempt to surrender.[4]  The record is not entirely clear whether his arms were in fact raised as he ran across Texas Avenue.[5]

The record is clear that Officer Schooler was the first to open fire on Gilbert. Her police report, in pertinent part, states as follows:

> At some point I became aware that other officers were behind the building. I heard Sgt. S. French advise on the radio that the robbery was in progress . . . I heard Pottinger and possibly French on the radio advising a suspect was coming out the back door. I heard some type of scuffle coming from the northwest corner of the building. I then heard a gunshot at the same time I saw a muzzle flash from that area. Then a suspect ran from that area toward Texas Avenue. I shouted once or twice for the suspect to stop but he continued running. I then fired my shotgun at the suspect. He

---

[3] However, we note that when the officers were interrogating Gilbert at the hospital, Gilbert stated that he thought he had been shot by a male.

[4] Gilbert also disputes the factual basis for his criminal conviction, claiming that Hall forced him against his will to commit the robbery. Since the instant appeal is not an appeal of his criminal conviction, but rather, is only an appeal of the district court's entry of judgment in favor of the Defendants for Gilbert's § 1983 claims, we will not conduct a review of the factual basis for the jury's criminal conviction. Instead, we review only those facts that are pertinent to the district court's adjudication of Gilbert's § 1983 excessive force and failure to intervene claims.

[5] Gilbert never claims that he actually stopped running or that he verbally announced a surrender.

> continued running toward Texas Avenue so I fired at him again. He still was running so I attempted to fire a third time. My shotgun did not discharge so I racked it once and fired it a third time at the suspect. By this time the suspect had reached Texas Avenue and ran across. As soon as the suspect reached the grass east of the street, he collapsed onto the ground face-down . . . .

Officer Amaya, who was the closest officer to Schooler during the shooting, reported that he saw Gilbert running across the street and witnessed Schooler shooting at Gilbert while he crossed the street. Amaya, however, does not state whether Gilbert's arms were up or down as he crossed Texas Avenue.

Hines reported that as he watched Gilbert run by Schooler, Gilbert turned to his right and "almost stopped." Hines claims that Gilbert then faced both Schooler and Amaya– although Hines admits that his view of this scene was partially blocked by Schooler and Amaya. Hines then watched as Gilbert turned and began once again to run across Texas Avenue. Hines claims he fired four rounds at Gilbert as Gilbert crossed the street.

Harrison's account of this same scene is similar to Hines's, as he states, in pertinent part:

> [Gilbert] then slowed down and turned to face his body and hands toward us. Officer Schooler then fired her shotgun at the subject. The subject then turned back and continued to run towards and across Texas. As the suspect started crossing Texas, he again slowed and faced towards us with his hands slightly extended in front of him. I started firing and the suspect turned around and started running again. I believe I fired two or three rounds at the subject.

After sustaining two gunshot wounds, Gilbert was transported to St. Joseph Hospital, where he received medical treatment. Gilbert was eventually

arrested, yet he remained in the hospital for three days until he was released to police custody.

On December 14, 2006, Gilbert filed his *pro se* complaint, bringing suit against sixteen City of Bryan police officers, alleging various civil rights violations cognizable under 42 U.S.C. § 1983. Specifically, Gilbert alleged that certain City of Bryan police officers used excessive force against him, that others failed to intervene on his behalf to prevent the use of excessive force, and that two others delayed his access to medical care to treat his resulting gunshot wounds. He also claimed that these actions were conducted pursuant to a Bryan police department policy of racial profiling.

The Defendant-Appellees filed a motion to dismiss, or in the alternative, a motion for summary judgment. On February 12, 2008, the district court entered an order granting in part, and denying in part, the Defendant-Appellees' motion. The district court concluded that the doctrine of qualified immunity shielded the police officers from any liability for Gilbert's excessive force and failure to intervene claims against the officers in their individual capacities, and accordingly, granted summary judgment in their favor. Furthermore, the district court concluded that Gilbert had failed to sufficiently plead an Equal Protection claim of disparate treatment, and as a result, the district court dismissed Gilbert's claim of racial profiling in accordance with Fed. R. Civ. P. 12(b)(6).

The district court denied Defendant-Appellees' motions for summary judgment based on Gilbert's delayed access to medical treatment claim and failure to train/supervise claims against the City. Gilbert then filed an appeal from the February 12, 2008 order, which this Court dismissed as said order did

not constitute a final order at the time of Gilbert's initial appeal. Thereafter, the district court severed the claims disposed of in its February 12, 2008 order from the remaining claims sought by Gilbert and declared by written order the February 12, 2008 order a final judgment from which an appeal could be taken. The instant appeal from the February 2008 order followed, attacking the dismissal of the excessive force and failure to intervene claims.

The Plaintiff-Appellant raises three points of error. First, Gilbert asserts that the district court erred when it refused to appoint him counsel. Liberally construing his second argument, Gilbert contends that the district court erred when it granted the Defendant-Appellees' motion for summary judgment for Gilbert's excessive force and failure to intervene claims, based on the doctrine of qualified immunity. And finally, Gilbert argues that the district court erred when it allegedly denied him his right to conduct discovery pursuant to the district court's April 26, 2007 order.

II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo. Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McNeil v. Wyeth*, 462 F.3d 364, 367 (5th Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact-issue is material only if its

resolution could affect the action's outcome." *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 465 (5th Cir. 2005).

Gilbert is proceeding *pro se.* Thus, we apply "less stringent standards to parties proceeding *pro se* than to parties represented by counsel and liberally construe the briefs of *pro se* litigants." *Grant v. Cuellari*, 59 F.3d 523, 524 (5th Cir. 1995). Under this standard, pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them. *See Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2000).

III.    ANALYSIS

A.    The District Court's Grant of Summary Judgment

Although the Plaintiff-Appellant did not state so explicitly in his brief on appeal, we liberally construe his second issue raised on appeal as arguing that the district court erred when it determined no genuine issue of material fact existed and granted summary judgment to the Defendant-Appellees based on the doctrine of qualified immunity. Thus, in considering whether the district court erred in its conclusion that no genuine issue as to any material fact existed to preclude summary judgment on Gilbert's excessive force and failure to intervene claims, we have given careful consideration to the facts in the record and Gilbert's characterization of them.

"Qualified immunity is designed to protect government officials in limited circumstances: 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus,

when a court rules upon a question of qualified immunity, the Supreme Court has stated that the court must first consider "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Sauicer v. Katz*, 533 U.S. 194, 201 (2001).  "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*  Now, however, lower courts may consider and decide the second *Saucier* factor without ever reaching the first; the Supreme Court has stated that "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

The district court was correct to grant the officers qualified immunity because Gilbert has failed to demonstrate that the officers' conduct violated a constitutional right.  First, we review Gilbert's claim that his constitutional rights were violated when Officers Hines, Harrison, and Schooler used excessive force to apprehend him as he fled from the crime scene.  Now on appeal, Gilbert argues that at the point that Officer Schooler first opened fire on him, he had ceased attempting to escape by running, and had turned to show her his hands and surrender.  Most notably, Gilbert offers a police report from Officer Harrison indicating that at the point that Officer Schooler shot him, Gilbert had already "slowed down and turned to face his body and hands toward[s]" the police.  We also note that Hines's report states that Gilbert "almost stopped" in the middle of Texas Avenue, before once again running to cross the street.

Neither Harrison nor Hines, however, indicate whether Gilbert was running with his arms fully raised, or if he appeared to be waiving his arms in

surrender. Amaya, who was standing closest to Schooler during the shooting, does not state whether Gilbert was running with his arms raised or down. And Officer Schooler, in her report, states that Gilbert was running with his arms down.

We cannot conclude that either Officer Harrison's or Officer Hines's statements regarding Gilbert's potential pause and momentary display of his hands in the middle of Texas Avenue serve to create a genuine issue of *material* fact. *See Minter*, 423 F.3d at 465 ("A fact-issue is material only if its resolution could affect the action's outcome."); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (internal quotations and citation omitted)).

That is, even if we were to adopt Gilbert's submitted evidence and characterization of the facts regarding whether he turned at the last second to show his hands just before Officers Schooler, Hines, and Harrison fired at him, in considering the legal precedents demarcating the constitutional boundaries of a police officer's use of "excessive force," it is clear that the facts presented here do not constitute a constitutional violation. Although there is no doubt that Gilbert has a Fourth Amendment right to be free from unreasonable search and seizure, the circumstances outlined in the present case cannot be characterized as "unreasonable"– even when considered in the light most favorable to Gilbert, the non-movant. In analyzing whether the present circumstances resulted in a violation of his Fourth Amendment rights, we must consider "whether the force used to effect a particular seizure [wa]s reasonable under the Fourth

No. 08-20296

Amendment. [This] requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. " *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations and citation omitted).

In applying the Supreme Court's "test of reasonableness," *id.*, we find that although Gilbert may have momentarily paused in the middle of Texas Avenue and turned to show his hands, considering *all* of the circumstances surrouding the armed robbery, the police officers were reasonable in the actions they undertook in an attempt to apprehend Gilbert. Our "test of reasonableness . . . requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Furthermore, the Supreme Court has held that:

> [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). "Moreover, '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.'" *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994) (quoting *Graham*, 490 U.S. at 396-397).

11

No. 08-20296

Given these constitutional parameters, we agree with the district court in its determination that Schooler's, Hines's, and Harrison's use of force in arresting Gilbert did not violate his constitutional rights– and consequently, that these officers were entitled to qualified immunity. The district court was correct in its assessment that the police officers use of force to restrain Gilbert "was reasonably premised on their belief that Gilbert posed an immediate threat to officers and the public."

The summary judgment evidence presented to the district court undisputably reveals that when the police officers arrived on the scene, they received information that an armed robbery was taking place inside the restaurant, someone was armed with a gun, and they knew that a dispatcher had heard, over an open telephone line to the restaurant, a male stating: "If he does not get any money, somebody is going to die." At the same time, one police officer observed a masked man armed with a gun through one of the restaurant's windows. Although Schooler, Hines, and Harrison themselves did not see the bleeding hostage or Hall's pistol, they were well aware of the aforementioned factors when, suddenly, they heard gunshots, saw the flash of a muzzle, and saw a masked man running in the night– from the crime scene towards Texas Avenue.

Although we may now find ourselves, with the depth of the record before us on appeal, tempted to question the officers' judgment in deciding to fire their weapons at Gilbert as he crossed Texas Avenue, the doctrine of qualified immunity requires us to give these officers adequate allowance for "the split-second judgmen[t they were forced to make] in circumstances that [we]re tense, uncertain, and rapidly evolving." *Stroik,* 35 F.3d at 158 (internal citations

12

and quotations omitted). The armed robbery that Gilbert and Hall undertook is exemplary of a tense, uncertain, and rapidly evolving situation– one that requires police officers to make split-second judgments that the doctrine of qualified immunity is designed to protect.

We conclude, therefore, that "[u]nder these circumstances, a reasonable officer could well fear for his safety and that of others nearby." *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991). Even if, just before Officer Schooler shot Gilbert, he did turn to show her his hands, we cannot conclude that Officer's Schooler's use of a deadly weapon in this set of circumstances violated Gilbert's constitutional rights. Although Gilbert offers Officer Harrison's and Officer Hines's reports to indicate that he slowed down momentarily and showed his face and his hands, there is no evidence or allegation that he slowed down and showed his hands for a sufficient amount of time– such that Officer Schooler could reasonably be expected to interpret his actions as a safe surrender and abandon her duty as a police officer to apprehend what she reasonably interpreted to be a criminal fleeing a dangerous crime scene. Given the severity of the armed robbery, the deadly weapon officers knew a suspect possessed inside the restaurant, the gunshots the three officers heard, and the fact that Gilbert himself was subsequently observed fleeing the scene while wearing a mask, we cannot conclude that it was unreasonable or in violation of the Constitution for Schooler, Hines, and Harrison to fire their weapons in attempt to apprehend Gilbert. "Under such circumstances, an officer is justified in using deadly force to defend himself and others around him." *Id.*

Further, because we find the police officers' actions in using deadly force to arrest Gilbert do not amount to an unconstitutional use of excessive force, it

13

No. 08-20296

follows that the district court was correct in granting judgment on Gilbert's failure to intervene claims. That is, an officer must be present at a scene involving another officer's use of excessive force before he may be held liable for failure to intervene. *See Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (An officer may be liable under § 1983 if she "is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force. . . ."). Since we conclude no officer used excessive force in apprehending Gilbert, we simultaneously conclude that no officer unconstitutionally failed to intervene.

Accordingly, we affirm the district court's grant of summary judgment on the Plaintiff-Appellant's § 1983 claims for excessive force and failure to intervene. The district court was correct to conclude that the individual police officers were entitled to qualified immunity for their actions.

B.    The District Court's April 26, 2007 Order

Gilbert also claims that the district court erred when, in its April 26, 2007 order, it denied him his right to conduct discovery. We have reviewed this order, however, and cannot conclude that the district court outright denied Gilbert the right to conduct any and all discovery. The district court's April 26, 2007 order is actually a "Service of Process" order, in which the district court declared that "[n]o further discovery will be allowed except on further order of the Court."

This is routine procedure at such an early stage in the proceedings, and as a result, does not constitute an abuse of discretion. In cases involving qualified immunity questions of this nature, the district court is correct to resolve the question of qualified immunity prior to permitting the plaintiff to proceed with discovery. This is because the Supreme Court has "made clear that

14

No. 08-20296

the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'" *Pearson*, 129 S.Ct. at 815 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, n. 2 (1987)).   Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

As a result, we find no error in the district court's April 26, 2007 order.

C.    The District Court's Denial of Motion to Appoint Counsel

We review a district court's denial of a motion for appointment of counsel for abuse of discretion. *Robbins v. Maggio*, 750 F.2d 405, 413 (5th Cir. 1985). "A federal court has discretion to appoint counsel if doing so would advance the proper administration of justice." *Ulmer v. Chancellor*, 691 F.2d 209, 213 (5th Cir.1985) (citing 28 U.S.C. § 1915(d) (1976)).  The district court should consider four factors in ruling on a request for appointed counsel: "(1) the type and complexity of the case; (2) whether [Gilbert] is capable of adequately presenting [his] case; (3) whether [Gilbert] is in a position to investigate adequately the case; and (4) whether the evidence will consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross examination." *Id*.

We note that although the district court did not explicitly discuss each of the four *Ulmer* factors, the district court's analysis indicates that these factors were sufficiently considered.  When the district court denied Gilbert's motion for appointment of counsel on October 24, 2007, the district court reasoned that:

> The primary issue presented in this case, which concerns whether individual police officers used excessive force to arrest the plaintiff during the commission of an armed robbery that involved hostages,

15

No. 08-20296

is fairly straight forward. The record reflects that the plaintiff's pleadings and motions are lengthy, detailed, articulate, and adequately researched. At this time, the case does not present exceptional circumstances showing that appointment of counsel is necessary.

We have reviewed the Plaintiff-Appellant's pleadings and submitted evidence, and concur in the district court's assessment that given the detailed arguments and evidence Gilbert has thus far presented, he is capable of adequately presenting his case. This is not the sort of case that will require special skill such as is necessary to cross-examine a witness or give a closing argument in a courtroom. As such, we do not find that the district court abused its discretion in denying Gilbert's motion for appointment of counsel on October 24, 2007.[6]

IV.    CONCLUSION

Accordingly, for the aforementioned reasons, we AFFIRM the district court's April 15, 2008 entry of judgment in favor of the Defendant-Appellees, with prejudice, on the Plaintiff-Appellant's § 1983 claims for excessive force and failure to intervene.

---

[6] To the extent that Gilbert is asking this Court to review the district court's denial of his motion to appoint counsel for representation relating to the remainder of his severed claims (specifically, the delayed access to medical treatment and failure to train/supervise Bryan City employees claims), we cannot entertain his request. Because the district court severed these claims on April 15, 2008, when it entered final judgment on his excessive force and failure to intervene claims, we do not have jurisdiction to review the district court's denial of his motion to appoint counsel for the adjudication of the severed claims.