# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 8, 2013

No. 12-10312

Lyle W. Cayce
Clerk

NATASHA WHITLEY,

Plaintiff-Appellant

v.

JOHN NICK HANNA; ROBERT BULLOCK; MICHAEL MURRAY;
ROBERT GRUBBS,

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before KING, DAVIS, and ELROD, Circuit Judges.

KING, Circuit Judge:

Plaintiff-Appellant Natasha Whitley appeals the dismissal of her 42 U.S.C. § 1983 action and the denial of her motion to amend her complaint. Whitley's claims arise out of former City of Brownwood police sergeant Vincent Ariaz's sexual abuse of her. Defendants-Appellees John Hanna, Robert Bullock, Michael Murray, and Robert Grubbs were state officers involved in the investigation and arrest of Ariaz. Whitley argues that Appellees failed adequately to protect her from Ariaz, and used her as "sexual bait" to strengthen their prosecutorial case against him. The district court granted Appellees' motions to dismiss after finding that Whitley failed to state a § 1983 claim and that Appellees would be

No. 12-10312

entitled to qualified immunity. It also denied Whitley's motion to amend her complaint. For the following reasons, we AFFIRM the district court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2000, the City of Brownwood created Explorer Post 1150 as part of the "Explorers" program—a school- and work-based program to introduce young people to various vocations. Explorer Post 1150 was established to teach participants about law enforcement, including police training and operations. Vincent Ariaz, a then-sergeant with the City of Brownwood Police Department, acted as Explorer Post 1150's advisor. In January 2007, Ariaz was investigated for alleged abuse of one of the program's female participants ("A.M."). A Brownwood police officer, together with appellee Texas Ranger John Hanna, conducted the investigation.

Hanna interviewed A.M., and learned that Ariaz would use her as an example for activities like handcuffing and have her stay late when no one else was around. Hanna also discovered from A.M. that Ariaz would rub his body against hers and ask her about her sexual experiences. A.M. further informed Hanna of an incident in which she and Ariaz were alone in a storeroom. Ariaz allegedly closed the door, turned off the lights, and proceeded to kiss A.M. and fondle her breasts. Despite A.M. telling him to stop, Ariaz continued until she was able to make noise and escape. A.M.'s mother and her then-boyfriend also told Hanna that Ariaz had sent A.M. numerous sexually suggestive text messages, including proposing having sex in a motel room. The boyfriend also lodged a complaint against Ariaz, to no apparent effect. An affidavit by another police officer stated that Ariaz had expressed a desire to engage in different sexual acts with a young girl.

Whitley's allegations do not disclose what action, if any, the City of Brownwood or the Brownwood Police Department took in response to Hanna's investigation or Ariaz's conduct. We do know that Ariaz continued as a police

2

officer for the City of Brownwood.  Hanna, following his investigation, notified his lieutenant, appellee Robert Bullock, that he had obtained a "written statement detailing a pattern of sexual harassment, text messages of [a] sexual nature, and one incident of sexual contact."  The report was approved by Bullock on February 19, 2007, and stated that the investigation "would remain active."

Sometime thereafter, Ariaz's attention shifted to another Explorers participant—fifteen-year-old appellant Natasha Whitley.  Ariaz began "grooming" Whitley by giving her gifts, promoting her to the highest position in the Explorer post, repeatedly using her as his example in class, and writing her love notes that she kept in her Explorers locker.  Ariaz's advances grew progressively more intimate and eventually became sexual around June 2007.

Although various individuals were aware that Ariaz was engaging in suspicious conduct, it does not appear that Hanna learned of this until July 3, when another member of the Brownwood Police Department, Richard Williams, noticed Whitley driving Ariaz's truck and questioned her.  In the course of speaking with her, Williams learned that Ariaz and Whitley drove together on a nightly basis.  Williams thereupon contacted Hanna, who resumed his investigation and quickly confirmed that Ariaz allowed Whitley to drive his vehicle, rode with her almost every night, and spent hours with her parked in locations that were secluded or known "make out" areas.

On July 9, Hanna met with the Brown County District Attorney, appellee Michael Murray, and the Brown County Sheriff, appellee Bobby Grubbs.  Also present were Brown County's Assistant District Attorney, a District Attorney investigator, the Brown County Chief Deputy, a sergeant with the Texas Department of Public Safety, a Brownwood police sergeant, and members of the West Central Interlocal Drug Task Force.  The group discussed Hanna's investigation into Ariaz's conduct and agreed that Hanna would continue monitoring Ariaz to catch Ariaz in the act of abusing Whitley, and thus

No. 12-10312

strengthen the prosecutorial case against him.  Bullock endorsed the plan after Hanna informed him of the July 9 meeting.

Hanna proceeded to install video surveillance cameras in the hallways of the Brownwood Annex building—one of the locations Ariaz was known to take Whitley.  Hanna also initiated GPS surveillance of Ariaz's car.  On July 10 and 11, Ariaz was observed with Whitley in the Annex building.  Ariaz repeatedly hugged and kissed Whitley.  Ariaz also was observed entering an Annex building courtroom where Whitley was waiting, and later exiting without his belt, followed by Whitley, who emerged adjusting her shirt.  Ariaz and Whitley were known to spend lengthy periods of time in the Annex building courtroom.  Hanna informed Bullock, Murray, and Grubbs of these events.

On July 12, Hanna assembled three two-man teams to surveil Ariaz and Whitley.  Over the following days, Ariaz and Whitley repeatedly were observed engaging in the previously documented conduct.  On July 17, Hanna and another investigator hid themselves in the closet of the courtroom Ariaz and Whitley previously had entered.  Sometime after 2:30 a.m., Hanna witnessed Whitley sitting or lying on a table with Ariaz positioned over her.  Ariaz and Whitley then left, but returned at 6:13 a.m.  Whitley lay down, and Ariaz proceeded to kiss her for several minutes.  He then placed his head in Whitley's "crotch area," whereupon Hanna exited the closet and intervened.  Ariaz was arrested and indicted on more than twenty-five counts of sexual assault of a child and two counts of indecency with a child.[1]  He ultimately pleaded guilty to two counts of sexual assault of a child and no contest to indecency with a child.  Ariaz currently is serving a twenty-year prison sentence.

On November 3, 2008, Whitley's parents filed suit in federal district court against, among others, the City of Brownwood, the Brownwood Police

---

[1] The indecency with a child counts appear related to Ariaz's conduct with A.M. in January 2007.

No. 12-10312

Department, the Brownwood Chief of Police, and the Boy Scouts of America, in an action styled *Whitley v. Ariaz, et al.*, No. 6:08-CV-85-C. That lawsuit was dismissed upon settlement.

On August 19, 2011, Whitley herself filed suit against Hanna and Bullock, in their individual capacities, and against Murray and Grubbs in their individual and official capacities (collectively, "Appellees"). Whitley also sought declaratory and injunctive relief against Appellees in their official capacities. Her complaint primarily contended that Appellees violated her constitutional rights by failing timely to intervene to stop Ariaz's abuse of her.

Murray and Grubbs filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on September 13. On the same day, Hanna and Bullock filed a separate motion to dismiss for failure to state a claim under Rule 12(b)(6), in which they asserted qualified immunity. Subsequently, Murray and Grubbs filed an original answer in which they also raised a qualified immunity defense. Following the filing of Appellees' motions to dismiss, Whitley filed a motion to amend her complaint.

In an order entered on February 21, 2012, the district court granted both motions to dismiss and denied Whitley's motion to amend her complaint. The district court began by reviewing the proposed amended complaint and concluded that the amendments were "nothing more than reiterations of the original § 1983 claim premised upon substantive due process rights." The court viewed the proposed amendments only as alleging that Appellees engaged in a conspiracy to deprive Whitley of her constitutional rights, a claim that was not actionable under § 1983 without an underlying constitutional violation. Further, it found that "the proposed additional facts that [Whitley] wishes to add to her pleadings do nothing to change the claims brought by [her]." Accordingly, the district court held that granting Whitley's motion to amend her complaint would be futile and denied her motion.

Turning to Appellees' motions to dismiss, the district court found that dismissal was warranted. "At the heart of the allegations is [Whitley's] claim that the [Appellees] should have concluded their investigation sooner and arrested Ariaz sooner, thus preventing further sexual acts against her." The court determined that Whitley's § 1983 claims failed because there was no constitutional right to have criminal charges filed against someone or to have that person investigated.

The district court likewise was unpersuaded by what it construed as Whitley's attempts to establish supervisory liability over Appellees. First, to the extent Appellees were involved in Ariaz's misconduct, the district court found that they actively were investigating him and thus their behavior did not fall within the purview of cases that permitted claims against state actors who failed to protect victims from harm. Second, the district court noted that Appellees did not supervise Ariaz and actually were employed by completely separate entities. Properly construed, the district court reasoned, Whitley's allegations really fell under a "state-created-danger theory," because Appellees—as state actors—allegedly acted with deliberate indifference in creating or increasing a danger to her. But such a theory also requires that the state actors create an opportunity that otherwise would not have existed, which the district court found was not the case. Further, it noted that this circuit has declined to adopt a state-created-danger theory to trigger affirmative duties under the Due Process Clause. The district court thus granted Appellees' motions to dismiss.

Whitley timely filed a notice of appeal on March 15, 2012, asserting that the district court erroneously granted Appellees' motions to dismiss her § 1983 claims and denied her motion to amend her complaint.

## II. STANDARD OF REVIEW

This court reviews a district court's grant of a motion to dismiss de novo. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012). The grant

of a motion to dismiss based on qualified immunity similarly is reviewed de novo. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). We accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff. *Bowlby*, 681 F.3d at 219 (citation omitted). The facts taken as true must, however, "state a claim that is plausible on its face." *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 254 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is insufficient if it offers only "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

We review a district court's denial of a motion for leave to file an amended complaint for abuse of discretion. *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010). However, where a district court's denial solely was based on futility, this court applies a de novo standard identical, in practice, to the standard used for reviewing a motion to dismiss for failure to state a claim. *See Wilson v. Bruks–Klockner, Inc.*, 602 F.3d 363, 368 (5th Cir. 2010).

### III.  APPLICABLE LAW

**A.    Section 1983**

Section 1983 provides a claim against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another's constitutional rights. 42 U.S.C. § 1983. "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

No. 12-10312

## B.     Qualified Immunity

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and courts will not deny immunity unless "existing precedent . . . placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).   Therefore, a plaintiff seeking to overcome qualified immunity must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 2080 (citation omitted).   A court has discretion to decide which prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## IV.   DISCUSSION

On appeal, Whitley presents two theories of liability she asserts warrant reversal of the district court's decision.   First, relying on our decision in *Doe v. Taylor Independent School District*, 15 F.3d 443 (5th Cir. 1994) (en banc), Whitley argues that Appellees are liable under § 1983 for acting with deliberate indifference to her constitutional rights by engaging in an investigation premised on catching Ariaz (the primary constitutional wrongdoer) in the act of abusing her.   Second, citing to *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995), Whitley asserts that Appellees are liable under § 1983 under a theory of bystander liability because they failed to stop Ariaz, a fellow officer, from violating Whitley's fundamental liberty interest in her bodily integrity.[2]   Lastly,

---

[2] Whitley also asserts that she has sufficiently stated a constitutional violation under *Rochin v. California*, because Appellees' conduct shocked the conscience. *See* 342 U.S. 165, 166, 172–74 (1952) (conduct "shock[ed] the conscience" and violated the Due Process Clause

8

No. 12-10312

Whitley contends that the district court erred in denying her motion to amend her complaint.

We address each of her theories below, and conclude that Whitley fails to state a claim under either her deliberate indifference or bystander liability theory.[3]  Our conclusion that Whitley fails to state a claim as to any of the Appellees also resolves the question of qualified immunity raised in Hanna and Bullock's motion to dismiss.[4]  *See Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) ("If we determine that the alleged conduct did not violate a constitutional right, our inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity."); *Hampton v. Oktibbeha Cnty. Sheriff Dep't*, 480 F.3d 358, 363 (5th Cir. 2007). Finally, we hold that the district court correctly denied Whitley's motion to amend her complaint.

where arresting police officers ordered doctors to pump suspect's stomach to induce him to vomit two morphine capsules).  During oral argument, Whitley expressly limited the grounds on which she sought relief and it thus is unclear whether she is still pursuing a claim under *Rochin*'s shocks-the-conscience standard.

As will be discussed, however, the alleged facts do not rise to the level of shocking the conscience: Whitley has not alleged that Appellees themselves sexually abused her; at best, she has shown that Appellees conducted a deficient investigation and failed to intervene earlier.  Such circumstances do not conform to the extreme cases in which the shocks-the-conscience standard typically has been satisfied. *See, e.g.*, *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) (teacher fabricated sexual abuse charges against a student's father); *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 797 (8th Cir. 1998) (police officer raped woman in her house after stopping her for traffic violation).

[3] To the extent Whitley asserts claims against Appellees in their official capacities, we find such claims also fail for lack of an underlying constitutional violation. *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (municipal liability under § 1983 requires "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." (citation omitted)).

[4] The district court seemingly conflated Appellees' motions to dismiss as "Motions to Dismiss Based Upon Qualified Immunity," despite only Hanna and Bullock asserting qualified immunity in their motion.  Importantly, however, the district found that Whitley "failed to state a claim under § 1983 against the [Appellees], and certainly not such that would overcome their assertion of qualified immunity."  Accordingly, it appears that the district court sufficiently addressed both motions to dismiss.

No. 12-10312

## A.    Deliberate Indifference

Whitley's first basis for establishing liability under § 1983 is "the decision by [Appellees] as part of their investigation, to knowingly allow Whitley to be repeatedly raped by another police officer." Put another way, Appellees purportedly acted with deliberate indifference by agreeing on a plan that would allow Ariaz to continue sexually abusing Whitley for the sake of gathering additional evidence to secure his conviction.[5] In support, Whitley primarily relies on our decision in *Taylor*, 15 F.3d 443.[6]

In *Taylor*, we considered whether a school's principal and the district's superintendent could be held liable under § 1983 for failing to prevent a high school coach from manipulating a fifteen-year-old student over several months into repeatedly having sexual intercourse with him. *Id.* at 446–49. In affirming the district court's denial of qualified immunity to the principal, but reversing the denial of qualified immunity to the superintendent, we held that:

> A supervisory school official can be held personally liable for a subordinate's violation of an elementary or secondary school

---

[5] Whitley's allegations resemble—and the district court actually understood her to assert—a claim under a state-created-danger theory of liability, by which state actors may be held liable when "the state actor played an affirmative role in creating or exacerbating a dangerous situation that led to the individual's injury." *McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir. 2002). Given Whitley's allegation that Appellees put her in harm's way in order to secure Ariaz's conviction, the district court's interpretation is understandable. However, this court has not adopted the state-created-danger theory, *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 865 (5th Cir. 2012) (en banc), and Whitley wisely has disclaimed reliance on it.

[6] Whitley also relies on the Supreme Court's decision in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Whitley first refers to this case in her reply brief and then only for the proposition that "a § 1983 case should not be dismissed when the allegation is that a prosecutor and police officers made decisions and carried out actions as part of a criminal investigation that violated constitutional rights." The problem with Whitley's argument is that it assumes the very thing she seeks to prove—that it was a constitutional violation for Appellees to delay removing Whitley from Ariaz's presence to collect additional evidence. By contrast, the county prosecutor in *Pembaur* ordered deputy sheriffs to forcibly enter a clinic in violation of a doctor's Fourth Amendment rights. *Id.* at 484.

student's constitutional right to bodily integrity in physical sexual abuse cases if the plaintiff establishes that:

> (1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and
> (2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and
> (3) such failure caused a constitutional injury to the student.

*Taylor*, 15 F.3d at 454.

Subsequently, in *Doe v. Rains County Independent School District*, 66 F.3d 1402 (5th Cir. 1995), we expanded our holding in *Taylor* to include non-supervisory state officers. We determined that "once . . . a constitutional violation has occurred, we are no longer barred from finding another person liable under § 1983 for committing a state-law breach that caused the constitutional injury, even if the breach itself does not independently satisfy the elements of a constitutional claim." *Id.* at 1409. We reached this conclusion by "ask[ing] what it is about a supervisor's duties and functions that renders a state supervisory official liable for a constitutional deprivation by a subordinate." *Id.* at 1410. We concluded that "it is state law's grant of a right of legal control over the immediate perpetrator of an injury that establishes that a state supervisor possessed and exercised state authority." *Id.* at 1413. The "critical question" in determining whether a non-supervisory state actor may be held liable thus is "whether state law has reposed in a defendant enough responsibility for the underlying conduct that she can be said to have caused the injury herself." *Id.* at 1408.

Accordingly, Whitley must show that (1) Appellees knew of a pattern of constitutional deprivations; (2) the abuse was caused by a state actor over whom they had supervisory authority or a state-law created right of legal control; (3)

No. 12-10312

Appellees' failure to act demonstrated deliberate indifference to the victim's constitutional rights; and (4) their failure to act resulted in a constitutional injury. Because we conclude that Appellees were not deliberately indifferent, we limit our analysis to the third element, and hold that Whitley's § 1983 claims fail under her deliberate indifference theory.[7]

"The deliberate indifference standard is a high one." *Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). "To act with deliberate indifference, a state actor must 'know[] of and disregard[] an excessive risk to [the victim's] health or safety.'" *McClendon*, 305 F.3d at 326 n.8 (alterations in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "The state actor's actual knowledge is critical to the inquiry"—a "failure to alleviate 'a significant risk that he should have perceived but did not,' while 'no cause for commendation,' does not rise to the level of deliberate indifference." *Id.* (quoting *Farmer*, 511 U.S. at 837). While we previously have observed that the terms "gross negligence" and "deliberate indifference" are sometimes used

---

[7] Although disposing of this case on deliberate-indifference grounds, we note that Appellees seriously call into question whether law enforcement officers in cases like the one *sub judice* can be said to have what we term "the linchpin in all cases in which we have found § 1983 liability based on breach of a duty to act" namely, "the existence of a legal right of control," i.e., state-conferred control "over the persons or events giving rise to the injury complained of." *Rains*, 66 F.3d at 1414–15; *see also Taylor*, 15 F.3d at 452 n.6 (the "mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 n.58 (1978)). Appellees forcefully argue that the Supreme Court's decision in *Town of Castle Rock v. Gonzales*, entirely forecloses Whitley's deliberate indifference theory of liability because, although *Gonzales* denied an individual's purported entitlement to police enforcement of a restraining order against a private party, the same principle should apply where the violative agent is a state actor. *See* 545 U.S. 748, 768 (2005) ("In light of today's decision . . . the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations."). To do otherwise, they assert, would deprive law enforcement officers of the very discretion the Supreme Court repeatedly has recognized them to possess. *See id.* at 760 ("A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes."). Expressing no opinion, we leave for another day the extent to which *Gonzales* supplements or supplants our analysis under *Rains*.

12

interchangeably, understood properly, "the former is a 'heightened degree of negligence,' [while] the latter is a 'lesser form of intent.'" *Taylor*, 15 F.3d at 453 n.7 (citation omitted).

In this case, the district court found that Appellees did not act with deliberate indifference because they were "acting on facts and investigating Ariaz." Whitley contends that the district court's finding was erroneous because Appellees' investigation clearly was flawed, and identifies multiple indicators Appellees had that Ariaz—even before meeting Whitley—was engaging in sexual misconduct. Whitley also highlights purported deficiencies in the investigation itself.

We agree with the district court that neither Hanna and Bullock, nor Grubbs and Murray, were deliberately indifferent.

1.    Hanna and Bullock

a)    Hanna

We begin our analysis by considering Hanna's investigation, which, while possibly subject to criticism and charges of deficiency, cannot be said to have been conducted with deliberate indifference. Hanna began investigating Ariaz in January 2007, and spoke with A.M., A.M.'s mother, and her boyfriend. Although the investigation did not, at that time, result in the arrest and prosecution of Ariaz, the investigation remained open.

Over the next several months, there were numerous incidents indicating that Ariaz's attention had shifted to a new victim—Whitley. Ariaz repeatedly used Whitley as his example in class, and made her his Explorers captain. He also ate with Whitley in view of other Brownwood Police Department officers. It apparently was well-known that Ariaz and Whitley would ride together during the night shift. But while the Brownwood Police Department may have been aware of Ariaz's conduct, Hanna was not. Hanna had no reason to think that the Brownwood Police Department, as Ariaz's supervisor, would fail to respond

to evidence that Ariaz again was targeting a minor, including sharing such evidence with Hanna.[8]

Hanna's failure to discover Ariaz's new relationship earlier thus is no ground for finding him deliberately indifferent. In *Taylor*, we found a school superintendent not deliberately indifferent partly because he reacted promptly to new evidence of a high school coach's sexual misconduct. 15 F.3d at 457–58. Similarly here, when Hanna received word that Ariaz again was seen with a minor, he immediately resumed his investigation. From that point on, Hanna undertook a series of measures that appropriately responded to the evidence available to him, including:

- learning that Ariaz was riding with Whitley almost every night, and allowing her to drive his vehicle;

- discovering that Ariaz, accompanied by Whitley, would park for two to three hours in remote areas such as the Brownwood airport, a wooded area by the Brownwood Hospital, and an old police department;

- meeting with Murray, the Brown County district attorney, and Grubbs, the Brown County sheriff, and others to discuss Ariaz's behavior;

- installing video surveillance cameras in the Brownwood Annex building, one of the isolated locations Ariaz was known to take Whitley;

- placing GPS surveillance on Ariaz's vehicle, despite Ariaz previously having requested vehicles without GPS tracking;

- assembling three two-man teams to surveil Ariaz and Whitley;

- organizing a sting operation that resulted in the arrest and prosecution of Ariaz.

Whereas Hanna's previous investigation into Ariaz did not result in a prosecution, Hanna's actions upon learning that Ariaz was seen with Whitley demonstrate that, while the Brownwood Police Department apparently had been

---

[8] We again note that the Brownwood Police Department would later be involved in a suit brought by Whitley's parents resulting in a settlement.

unable to stop Ariaz, Hanna was committed to putting an end to Ariaz's abuses once and for all.

Whitley criticizes various aspects of Hanna's investigation, but these do not amount to a showing of deliberate indifference. She accuses Hanna of improperly placing surveillance cameras in the Brownwood Annex building's hallways, instead of in its courtroom. But the mere "haphazard" or "negligent" deployment of security measures does not establish deliberate indifference. *Johnson v. Dall. Indep. Sch. Dist.*, 38 F.3d 198, 202 (5th Cir. 1994). Whitley also criticizes Hanna for conducting an excessively long investigation. Yet, in light of Ariaz's persistent conduct, even in the face of other members of the Brownwood Police Department knowing of the suspicious activity, we cannot fault Hanna for wanting to ensure that this time the investigation would conclude with Ariaz's successful prosecution. At most, Whitley has shown that Hanna's actions were comparable to those of *Taylor*'s superintendent. After observing that the superintendent had directed the principal to talk with the coach suspected of sexual abuse, contacted parents, spoken with the victim, and verbally reprimanded the coach, we determined that although the superintendent's actions had been "ineffective," they were not "deliberately indifferent." 15 F.3d at 457–58. As in that case, although we do not deny the possibility that Hanna could have conducted the investigation differently, perhaps even gathering enough evidence to make an arrest in less than the two weeks it took him, Hanna's failure to immediately end the abuse does not make him deliberately indifferent. *See Dall. Indep. Sch. Dist.*, 153 F.3d at 219 ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity.").[9]

---

[9] Instead of looking to whether Hanna's conduct was appropriate in light of the available evidence, *see Rains*, 66 F.3d at 1413 (school official "fail[ed] to take appropriate

No. 12-10312

Hanna had to decide what evidence would suffice to secure a conviction. His decision to wait two or three days longer to make a stronger case to permanently stop Ariaz's misconduct does not bring this case within *Taylor*'s fact pattern, where we denied qualified immunity to a school principal on the ground that he "fail[ed] to take action that was obviously necessary to prevent or stop" the sexual misconduct of a subordinate high school coach. 15 F.3d at 457. Far from failing to take action, Hanna led an ongoing effort to put Ariaz out of business. In this, Hanna was successful. His failure to be successful earlier does not make him deliberately indifferent to Whitley's plight.

Whitley also appears, however, to allege that Hanna was deliberately indifferent because he failed to intervene when Ariaz sexually abused her in Hanna's presence. This argument refers to Hanna's failure immediately to emerge from his courtroom hiding place upon witnessing Ariaz positioned atop of her the morning of July 17, 2007. We find it worthwhile to quote this part of Whitley's complaint in its entirety:

- At approximately 2:30 a.m. on July 17, 2007, Hanna hid in the courtroom's closet with another investigator.

- He observed [Whitley] sitting or lying on a table with Ariaz positioned over her in a clearly inappropriate and sexual

---

action to prevent or stop the abuse"); *Taylor*, 15 F.3d at 458 (superintendent "responded appropriately")*,* the concurrence instead would look to whether "the purpose of [the defendant's] actions was to *interfere with* the alleged abuse," and criticizes us for suggesting that Hanna faced a "binary choice: arrest Ariaz, or do nothing to intervene in the absence of conclusive evidence of abuse." We do not dispute that Appellees had other options available to them, but we refuse to find Appellees deliberately indifferent for choosing one permissible course of action—conducting an investigation intended to effectuate the arrest of Ariaz—over another. *Cf. Taylor*, 15 F.3d at 457–58 (describing superintendent's investigation into alleged abuse as sufficient based on the available evidence); *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 256 (5th Cir. 2005) (deliberate indifference sufficiently alleged where defendants allegedly knew that a dangerous drug was missing and patients were dying at an unusually high rate, but failed to investigate or change hospital policy). Even applying the concurrence's standard, and accepting that better policing might have led to a speedier conclusion to the investigation, we are hard-pressed to see how the arrest and prosecution of Ariaz cannot be said to have had the purpose of "interfer[ing] with" the alleged abuse.

16

manner.

- Yet Hanna still did not intervene.

- Instead, he let Ariaz continue and then let them leave.

- According to Hanna, he remained at the Annex so that he would be more ready the next time to catch Ariaz in the midst of a more prolonged act.

- Then, according to Hanna, Ariaz and [Whitley] arrived back at the Annex at 6:13 a.m. Ariaz began kissing [Whitley] in the courtroom for several minutes while [Whitley] was lying down. Then, Hanna observed him place his head in [Whitley's] "crotch area."

Whitley's proposed amended complaint, which we separately address *infra*, elaborates only slightly on these facts: "[Hanna] observed Plaintiff sitting or lying on a table with Ariaz positioned over her in a clearly inappropriate and sexual manner. Ariaz was touching Plaintiff's genitalia." Hanna ultimately emerged and arrested Ariaz when he observed Ariaz placing his head in Whitley's genital area after the two returned at 6:13 a.m.

Several aspects of Whitley's complaint, as well as the relevant parts of her proposed amended complaint, draw our attention. Although Whitley's brief repeatedly describes Appellees as exposing Whitley to statutory rape (even going so far as accusing them of effectively raping Whitley herself by failing to act), the closest Hanna came to actually seeing Ariaz sexually abuse Whitley was to observe her sitting or lying while Ariaz was positioned over her. Whitley does not describe what Ariaz was doing other than to say it was "clearly inappropriate" and done in a "sexual manner." Additionally, while specifically describing what Hanna observed in every part of her complaint, Whitley noticeably omits in her proposed amended complaint whether or not Hanna observed Ariaz touching her genitals.[10] Hanna apparently could not even see

---

[10] The proposed amended complaint also states that Ariaz "had his hand in [Whitley's] crotch area for several minutes while [she] was lying down," but again does not state that

whether Whitley was sitting or lying down.

While we must view the facts in the light most favorable to Whitley, we also cannot ignore what she has, and has not, pled. Nor can we ignore that Hanna, after tracking Ariaz by camera, GPS, and officer surveillance, emerged from cover to arrest Ariaz after observing him engage in a clearly sexual act. Whitley may have alleged facts sufficient to show that Hanna made an error of judgment, but we refuse to find that Hanna's failure to act, after viewing some unspecified conduct that was "clearly inappropriate," transformed his otherwise proper investigation into one that was deliberately indifferent. *See Callis v. Sellars*, 931 F. Supp. 504, 519 (S.D. Tex. 1996) (officers' failure to timely intervene in sting operation amounted to isolated instance of negligence or error of judgment that did not amount to deliberate indifference).

Whitley thus has failed to allege facts sufficient to show that Hanna was deliberately indifferent.

> b)      Bullock

Having found that Hanna did not act deliberately indifferent, we similarly conclude that Whitley has not demonstrated that Bullock was deliberately indifferent in entrusting the investigation to Hanna. As with Hanna, the Brownwood Police Department's failure to notify the Texas Rangers of Ariaz's renewed involvement with a minor cannot be imputed to Bullock. Indeed, Bullock's involvement in the investigation was limited to receiving updates from Hanna on how the investigation was progressing, and approving Hanna's continuation of that investigation. Bullock was not even involved in the meeting in which Hanna, Murray, and Grubbs discussed Ariaz, and which resulted in the decision to continue surveilling Ariaz until there was actual evidence of sexual abuse. Whitley has alleged no facts suggesting that Bullock knew Hanna was

---

Hanna could observe this conduct.

acting improperly in seeking to collect additional evidence, especially as the prior investigation into Ariaz's conduct towards A.M. had not resulted in a prosecution. Whitley thus also has failed to show that Bullock was deliberately indifferent.

   2.   Grubbs and Murray

Whitley's primary reason for claiming Grubbs and Murray acted with deliberate indifference is that they participated in formulating, and endorsed, a plan dependant on catching Ariaz in the act of committing an act of sexual abuse. However, far from being the product of deliberate indifference, this plan was responsive to the requirements of the Texas penal code. Ariaz eventually was charged with sexual assault of a child and indecency with a child. Under Texas Law, the crime of sexual assault requires sexual contact or penetration. Tex. Penal Code Ann. § 22.011(a)(1)–(2). Similarly, the offense of indecency with a child requires exposure or "sexual contact," defined as "(1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person." *Id.* § 21.11. Video evidence only showed Ariaz hugging and kissing Whitley, actions which Appellees could not be certain a jury would find sufficient to violate the applicable criminal statutes. As Whitley acknowledges, Appellees only "had video proof that [Whitley] was likely being abused."

Grubbs and Murray also did not ignore Whitley's plight—to the contrary, they agreed that Hanna would investigate allegations of Ariaz's sexual misconduct in order to prosecute Ariaz. They were aware that Hanna was pursuing the investigation by setting up surveillance cameras, tracking Ariaz's movements, and devoting three two-man teams to surveilling him. Moreover, Grubbs and Murray were not telling Hanna to allow Ariaz to abuse Whitley, but

rather to gather evidence and stop Ariaz from doing so. Although Whitley alleges that, based on the evidence available to them, Grubbs and Murray must have known that Ariaz was sexually abusing her, there is no allegation that they actively facilitated Ariaz's behavior in order to gather more evidence.

Accordingly, although the decision to gather additional evidence may have been imprudent in light of that already available, we cannot say that Grubbs and Murray were deliberately indifferent to Whitley's peril. It is unclear, for example, what they should have done that was any more certain to safeguard Whitley's well-being or result in a favorable outcome to the investigation. They did not supervise Ariaz. They also did not have the authority to order the Brownwood Police Department to remove Ariaz from duty. At oral argument, Whitley's counsel admitted that Appellees, including Grubbs and Murray, also lacked the power to end the Explorers program. Further, while Grubbs and Murray arguably had the power to effectuate the arrest of Ariaz earlier in the investigation, Whitley has made clear that she is not premising her claim on Appellees' arresting Ariaz. Thus, although we easily can imagine some alternatives to the choice that Appellees made—including confronting Whitley or contacting her parents—the fact remains that Appellees successfully brought about Ariaz's arrest approximately two weeks after Hanna first learned of a potential relationship between Ariaz and Whitley.

We conclude that Whitley has not alleged facts sufficient to establish that Grubbs and Murray acted with deliberate indifference.

## B.     Bystander Liability

Whitley's second basis for establishing liability under § 1983 is Appellees' "failure . . . to attempt to intercede to protect [her] from further abuse at the hands of another officer." Whitley cites this court's decision in *Hale*, 45 F.3d 914, for the proposition that Appellees were required to intervene and stop Ariaz from further sexually abusing her.

No. 12-10312

In *Hale*, a plaintiff brought a § 1983 action for, *inter alia*, the use of excessive force during a search and arrest. *Id.* at 916. One of the police officer defendants allegedly stood by, laughed, and shouted encouragement while another officer assaulted the plaintiff. *Id.* at 919. Characterizing the plaintiff's claim as one of bystander liability, this court agreed that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Id.* We further observed that the fact that the police officers "were from different law enforcement agencies does not as a matter of law relieve [an officer] from liability for a failure to intervene." *Id.* In light of the allegations and evidence in that case, we concluded that there was sufficient evidence to create a genuine issue of material fact concerning the bystanding officer's "acquiescence in the alleged use of excessive force." *Id.*

Our holding in *Hale* is consistent with other circuits' determination that an officer may be liable under § 1983 under a theory of bystander liability where the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."[11] *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002) (footnote omitted); *see, e.g.*, *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002); *see also Nowell v. Acadian Ambulance Serv.*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001). However, liability will not attach where an officer is not present at the scene of

---

[11] Although *Hale* most often applies in the context of excessive force claims, other constitutional violations also may support a theory of bystander liability. *See Richie v. Wharton Cnty. Sheriff Dep't Star Team*, No. 12-20014, 2013 WL 616962, at \*2 (5th Cir. Feb. 19, 2013) (per curiam) (unpublished) (noting that plaintiff failed to allege facts suggesting that officers "were liable under a theory of bystander liability for failing to prevent . . . other member[s] from committing constitutional violations"); *accord Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").

the constitutional violation.[12] *See Snyder v. Trepagnier*, 142 F.3d 791, 801 n.11 (5th Cir. 1998) (citing *Hale*, 45 F.3d at 919); *see also Gilbert v. French*, 364 F. App'x 76, 83 (5th Cir. 2010) (per curiam) (unpublished); *Ibarra v. Harris Cnty. Tex.*, 243 F. App'x 830, 835 & n.8 (5th Cir. 2007) (per curiam) (unpublished) ("A bystander liability claim requires the plaintiffs to show that the officer was present at the scene and did not take reasonable measures to protect a suspect from excessive force."). In resolving whether a plaintiff has sufficiently alleged a bystander liability claim we also consider whether an officer "acquiesce[d] in" the alleged constitutional violation. *Hale*, 45 F.3d at 919; *see Baker v. Monroe Twp.*, 50 F.3d 1186, 1193–94 (3d Cir. 1995) (premising liability on senior officer's knowledge of, and acquiescence in, treatment of victim); *see also Peavy v. Dall. Indep. Sch. Dist.*, 57 F. Supp. 2d 382, 390 n.4 (N.D. Tex. 1999) (*Hale* inapplicable where defendant did not acquiesce in any conduct violating plaintiff's constitutional rights).

Applying this analysis to each of the Appellees, Whitley has failed to state a claim of bystander liability.

### 1.    Hanna and Bullock

We observe at the outset that Whitley has failed to state a claim against Bullock because she has not alleged that he was in Ariaz's presence when Ariaz

---

[12] Whitley disputes that this is a requirement for bystander liability. In support, Whitley's counsel referred us during oral argument to a case not cited in Whitley's briefs—*United States v. McKenzie*, 768 F.2d 602 (5th Cir. 1985). In that case, defendant police officers appealed their convictions for conspiring to deprive citizens of their civil rights and for illegally depriving one victim of his liberty, as well as failing to keep him free from harm while in official custody. *Id.* at 604. In addressing whether the evidence was sufficient to support a jury's guilty verdict as to one defendant, we observed that the defendant "admitted that he was in and out of the room while [the victim] was being interrogated," and found that this was "sufficient to support the conclusion that he was aware of what was transpiring and did not stop it." *Id.* at 605. *McKenzie*, however, was a criminal case and did not address bystander liability. Moreover, the detective in that case was in and out of the room, and thus arguably could be said to have been present while the alleged constitutional violation took place. *See id.*

was sexually abusing Whitley. As a result, Bullock is not within the scope of a bystander liability claim. *See Hale*, 45 F.3d at 919; *Ibarra*, 243 F. App'x at 835 & n.8. Even were we merely to require knowledge, Bullock still would not be liable because he acted reasonably in entrusting Hanna with investigating and arresting Ariaz.

Turning to Hanna, although Whitley has alleged that Hanna was in Ariaz's presence (unbeknownst to Ariaz) the morning of July 17, she nevertheless has failed to state a claim because she has not alleged that Hanna acquiesced in Ariaz's conduct. Hanna was investigating Ariaz with the intent of gathering evidence to secure Ariaz's conviction for sexual abuse of a minor. Far from being a bystander to Ariaz's conduct, Hanna was accumulating evidence for Ariaz's prosecution. This is in no way comparable to the factual scenario in *Hale*, where there was a genuine dispute over whether an officer's laughing and shouting encouragement to another officer who was committing a constitutional violation constituted acquiescence in the latter's conduct. Hanna's subsequent arrest of Ariaz after Ariaz began to engage in a clearly sexual act dispels all doubt as to whether Hanna acquiesced in Ariaz's misconduct. *Cf. Randall*, 302 F.3d at 204 n.24 ("The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer.").

Accordingly, we reject Whitley's bystander liability claims against Hanna and Bullock.[13]

---

[13] Even if bystander liability did apply, we nevertheless would be compelled to affirm the district court's judgment as to Hanna and Bullock on the second prong of the qualified immunity analysis because Whitley has failed to identify clearly established law requiring an officer immediately to intervene while engaged in covert surveillance of a perpetrator. *See Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (central concept of second prong of qualified immunity analysis is whether law provided "fair warning" that the conduct at issue violated constitutional rights). Whitley cites no case that would put Appellees on notice that they were required to intervene in some unspecified way before arresting Ariaz. *Cf. Callis v. Sellars*, 953 F. Supp. 793, 799 (S.D. Tex. 1996) ("Even today, the application of the

No. 12-10312

2.    Grubbs and Murray

Like Bullock, neither Grubbs nor Murray was in Ariaz's presence during Ariaz's abusive conduct.  They thus also are not bystanders for purposes of a bystander liability claim.  *See Hale*, 45 F.3d at 919; *Ibarra*, 243 F. App'x at 835 & n.8.  Further, they acted reasonably in attempting to stop Ariaz from further abusing Whitley and other minors by endorsing a plan that would lead to the arrest of Ariaz.  As discussed *supra*, it is unclear exactly what other actions Whitley would have required from Grubbs and Murray that were more certain to permanently remove her and others from Ariaz's reach.

For these reasons, we reject Whitley's bystander liability claims as to Grubbs and Murray.

## C.    Motion to Amend the Complaint

Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2). A motion to amend ordinarily should be granted absent some justification for refusal.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

> The liberal amendment policy underlying Rule 15(a) affords the court broad discretion in granting leave to amend and, consequently, a motion for leave to amend should not be denied unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed [or] undue prejudice to the opposing party by virtue of allowance of the amendment, . . ."

---

doctrine of bodily integrity to voluntary civilian participants in a 'sting' is an untrodden area of the law.").  The only case she cites is *Hale*, but, as discussed, that case is factually inapposite.  *See* 45 F.3d at 919; *see also Deshotels v. Marshall*, 454 F. App'x 262, 264, 269 (5th Cir. 2011) (per curiam) (unpublished) (distinguishing facts in *Hale* from case in which law enforcement officers failed to stop another officer from using a stun weapon to subdue an arrestee the officers were attempting to restrain).  We do not find that *Hale* put Hanna and the other Appellees on notice that they could not solidify their evidence against Ariaz to secure a conviction by surveilling him and arresting him upon commission of a felony.

24

No. 12-10312

*United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (alteration in original) (citation omitted). Leave to amend also may be denied when amendment would be futile. *Id.* at 387.

We find that, even under Rule 15's liberal standard, the district court appropriately denied as futile Whitley's motion to amend her complaint. First, the amended complaint adds no new substantive factual allegations. As already discussed, even if we read her complaint to allege that Hanna witnessed Ariaz sexually abusing Whitley, liability would not extend to Hanna—nor the other Appellees because Hanna was not deliberately indifferent and did not acquiesce in Ariaz's conduct.

Second, the amended complaint's new causes of action are meritless. Whitley adds supervisory liability claims, including for inadequate supervision and failure to train. She also adds policy, custom, and practice claims, alleging, *inter alia*, that it was "the practice of the Texas Rangers to permit minor sexual assault victims to be used as bait to catch their assailants." Finally, the amended complaint adds a series of "Secondary Liability Claims" including "Assisting and Encouraging / Aiding and Abetting sexual abuse and invasions of bodily integrity," "Assisting and Participating in violations of bodily integrity and sexual abuse," and "Conspiracy to violate Plaintiff's right to be free from violations of her bodily integrity and . . . sexual abuse," all in violation of § 1983.

All of Whitley's inadequate supervision, failure to train, and policy, practice, or custom claims fail without an underlying constitutional violation. *See Bustos v. Martini Club, Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) ("Because [plaintiff] has alleged no constitutional injury attributable to the Officers, [plaintiff] has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights."). Even if we assume that Whitley has sufficiently alleged a § 1983 claim, her municipal liability claims still would fail. "To establish municipal liability under § 1983, a plaintiff must show that

No. 12-10312

(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009). The proposed amended complaint makes no specific factual allegations of the county's policies and simply adds the words "policies, practices, and/or customs" to Whitley's perceived wrongs. Such allegations are insufficient to survive dismissal. *See Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (conclusory description of policy or custom insufficient).

Her secondary liability claims similarly fail for lack of a § 1983 violation by Appellees. *See Hale*, 45 F.3d at 920 ("[A] conspiracy claim is not actionable without an actual violation of section 1983." (internal quotation marks and citation omitted)). Additionally, her aiding and abetting, assisting and participating, and conspiracy claims merely restate her § 1983 allegations. For the same reasons we are unpersuaded by her § 1983 claims, we also reject her secondary liability claims.

We agree with the district court that amendment of her complaint would be futile and that Whitley's motion to amend correctly was denied.

## V. CONCLUSION

For the aforementioned reasons, the district court's judgment is AFFIRMED.

No. 12-10312

JENNIFER WALKER ELROD, Circuit Judge, concurring only in the judgment:

I write separately to address Whitley's § 1983 deliberate-indifference claim against Ranger Hanna. Taking Whitley's allegations as true, Hanna made a conscious decision to allow a fifty-five-year-old law enforcement official to engage in predictable, preventable, and yet repeated sexual assaults on a fifteen-year-old participant in a law-enforcement-learning program. Thus, at this early stage of the case, I would hold that Whitley states a plausible § 1983 claim. I concur in the judgment, however, because Whitley cannot overcome Hanna's assertion of qualified immunity.

I.

We must take Whitley's allegations as true at this 12(b)(6) stage of the case. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). Although the majority opinion offers a careful and thorough description of the complaint, some critical points bear repeating and, in some respects, reframing in the light most favorable to Whitley.

By January 2007, Hanna knew that Ariaz was a threat to the young female participants in the Explorer program. Although Hanna obtained credible evidence that Ariaz had kissed, fondled, sent numerous sexually suggestive text messages to, and expressed an intent to engage in "several different sexual acts" with his first victim (A.M.), Whitley alleges that Hanna "essentially stopped investigating." Over the next several months, Whitley asserts that Hanna did nothing "to protect any of the young girls Ariaz was supervising."

Shortly after A.M.'s complaint, Ariaz began "grooming" Whitley, a fifteen-year old Explorer student, to be his next victim. The relationship turned sexual in June 2007. Whitley alleges that, had Hanna "actually investigated Ariaz . . . [he] would have learned what Ariaz was up to and would have prevented him from abusing" her. But Hanna did not, in fact, learn of Ariaz's conduct until July 3, 2007, when an officer with the Brownwood Police Department reported

27

suspicious activity. Hanna quickly confirmed that Ariaz was "spending hours at a time alone with [Whitley] in the middle of the night," often parked in known "make out" areas. Yet, says Whitley, Hanna did not seek "to separate the predator from his prey."

To the contrary, Hanna decided to continue monitoring Ariaz to "catch him in the act of abuse." To accumulate evidence for an eventual prosecution, Hanna and a Brownwood officer placed a GPS-tracking device on Ariaz's car and installed surveillance cameras in the hallways of the Brownwood Annex, a common meeting place for Whitley and Ariaz. By July 12, 2007, Hanna had "video proof that [Whitley] was likely being abused." Specifically, Hanna observed Ariaz kissing and hugging Whitley several times in the Annex hallway, entering a courtroom where Whitley was waiting, and exiting the same courtroom without his duty belt thirteen minutes later. Despite this knowledge, Hanna allegedly made no effort to "put a stop to the abuse." Rather, says Whitley's complaint, Hanna "continued to use [her] as bait to catch Ariaz in the act of sexual offense," and thereby "knowingly allowed and provided substantial assistance to a fifty-five year old man to abuse a fifteen year old to better [his] chance at a conviction and make [his] investigation easier."

Ariaz continued to abuse Whitley for days, with bits and pieces of his inappropriate conduct captured on Brownwood Annex video cameras. In the early morning of July 17, 2007, Hanna hid in the courtroom closet with another investigator, where he observed Ariaz positioned over Whitley in a "clearly inappropriate and sexual manner." Hanna did not intervene to stop Ariaz's conduct, but "remained at the Annex so that he would be more ready the next time to catch Ariaz in the midst of a more prolonged act." Ariaz left the Annex with Whitley at around 2:30 in the morning. Hours later, at 6:13 a.m., Ariaz returned with Whitley; Hanna observed Ariaz kiss her for several minutes while

she was lying down, and ultimately place his head in Whitley's "crotch area." Only then did Hanna emerge from the closet and place Ariaz under arrest.

Taking these allegations as true, I would conclude that Hanna plausibly acted with deliberate indifference to Whitley's constitutional right to bodily integrity.

## II.

As a threshold matter, there is no reasonable debate that Ariaz violated Whitley's constitutional rights when he sexually assaulted her. We have long held that the Fourteenth Amendment affords a person "[t]he right to be free of state-occasioned damage to . . . bodily integrity." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450–51 (5th Cir. 1994) (en banc) (quoting *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981)).[1] Sexual abuse by a state official is an undeniable violation of this liberty interest. *See Taylor*, 15 F.3d at 451 ("[S]urely the Constitution protects a schoolchild from physical sexual abuse—here, sexually fondling a 15-year old school girl and statutory rape—by a public schoolteacher. . . . Thus, Jane Doe clearly was deprived of a liberty interest recognized under the substantive due process component of the Fourteenth Amendment." (footnote omitted)). We have called it "incontrovertible" that a state actor violates bodily integrity when s/he sexually abuses a child; "such

---

[1] As the Fourth Circuit explained, "[t]he existence of this right to ultimate bodily security . . . is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process. Numerous cases in a variety of contexts recognize it as a last line of defense against those literally outrageous abuses of official power . . . ." *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980). For example, in a case involving rape by a police officer after a traffic stop, the Eighth Circuit emphasized that the officer's sexual assault "was a violation of the most intimate kind of bodily integrity," and concluded that the district court did not err in concluding that the officer's "egregious sexual violation" deprived the victim of a due process right. *Rogers v. City of Little Rock*, 152 F.3d 790, 796 (8th Cir. 1998). In a case with nearly identical facts, the Fourth Circuit described the due process right at issue as a "right . . . not to be subjected by anyone acting under color of state law to the wanton infliction of physical harm." *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997).

misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment." *Id.* (footnotes omitted).

Critically, the existence of an underlying constitutional violation differentiates this case from *Gonzalez* and *DeShaney*, which examined the scope of a state official's duty to interfere with private violence. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 750–51 (2005) (analyzing whether an individual had a constitutionally protected property interest in the enforcement of a state-law restraining order against a private party); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989) (analyzing whether a child had a substantive due process right to protection from violent physical abuse by his father). As the Supreme Court explained in *DeShaney*, the Fourteenth Amendment was enacted to "protect the people from the State, not to ensure that the State protected them from each other." 489 U.S. at 196. Thus, although the substantive component of the Due Process Clause does not "requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors," it does protect against "*state-occasioned* damage to a person's bodily integrity." *Id.* at 195; *Taylor*, 15 F.3d at 450–51 (citing *Shillingford*, 634 F.2d at 265) (emphasis added).[2]

---

[2] The Supreme Court has cautioned that the Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Instead, for the conduct of a state actor to give rise to liability under the Due Process Clause, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8 (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)). In many contexts, what shocks the conscience is "deliberate indifference." *Id.* at 851; *see Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004) ("Consistent with those principles [in *Lewis*], we have generally required plaintiffs to demonstrate that 'the defendant state official at a minimum acted with deliberate indifference toward the plaintiff.'" (citation and internal quotation marks omitted) (collecting cases)). "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." *Lewis*, 523 U.S. at 851 (citing *Whitley v. Albers*, 475 U.S. 312, 320 (1986)); *see Brown v. Nationsbank Corp.*, 188 F.3d 579, 592 (5th Cir. 1999) (applying a deliberate-

No. 12-10312

Where, as here, a case involves an underlying constitutional violation like state-occasioned violence, the court must ask whether the state actor treated the violation with deliberate indifference. *See Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1413 (5th Cir. 1995) (noting that, in *Taylor*, "the supervisor's failure to act, coupled with his deliberate indifference, was tantamount to a conscious decision to allow the alleged constitutional injury to occur or persist"); *see also Taylor*, 15 F.3d at 463 (Higginbotham, J., concurring) ("An omission that evinces deliberate indifference toward the violation of an individual's constitutional rights may amount to an act that causes the violation.").[3] My primary concern here is with the majority opinion's approach to the deliberate indifference inquiry.

### III.

The deliberate indifference standard is a high bar, but it is not insurmountable. At this stage, Whitley must plausibly allege that Hanna made a "'conscious' choice to endanger [her] constitutional rights." *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)). Taking Whitley's allegations as true, that is precisely what happened here: Hanna decided to allow Ariaz, a state official, to continue

---

indifference standard where "the FBI made decisions which harmed the Plaintiffs after ample opportunity for cool reflection").

[3] For example, in the context of alleged abuse to foster children, we have held that "an obvious showing that state social workers exhibited a conscious disregard for known severe physical abuses in a state-licensed foster home by itself sufficiently demonstrates deliberate indifference to a child's right to personal security." *Hernandez*, 380 F.3d at 881 (concluding that two social workers did not act with deliberate indifference where, after an investigation, both concluded that there was no substantial risk to the children at issue). We have allowed a deliberate-indifference claim against hospital officials who turned a blind eye to a subordinate's alleged intentional poisoning of patients. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 256 (5th Cir. 2005) (holding that plaintiffs sufficiently pled deliberate indifference against two supervisors who allegedly "knew both that a dangerous drug was missing and that patients were dying at an unusually high rate," and noting that although they "could have investigated the deaths and missing drugs or changed hospital policy, they did nothing for a considerable period of time").

sexually assaulting Whitley in the hopes of obtaining stronger evidence against Ariaz. Whitley contends that Hanna was well-aware of the risk to her at the time; the plan was predicated on the fact that Ariaz had abused, and would continue to abuse, his young Explorer student.[4] In other words, Hanna allegedly knew that Ariaz was "highly likely to inflict the particular injury" that Whitley suffered, and Hanna chose not to act. *Cf. Brown v. Bryan Cnty., Okla.*, 219 F.3d 450, 461 (5th Cir. 2000) (citation omitted).

Moreover, Hanna's alleged conduct goes beyond mere haphazard or negligent investigation. The majority opinion analogizes Hanna's behavior to that of the superintendent in *Taylor*, highlighting that Hanna immediately resumed his investigation (after months of stagnation) when he learned that Ariaz was cavorting with another minor in the Explorers program.[5] But Hanna's conduct here is fundamentally different from that of the *Taylor* superintendent. In *Taylor*, the superintendent took affirmative, albeit ineffective, steps to end the abuse. 15 F.3d at 457–58. He directed the principal to talk with the coach suspected of sexual abuse, contacted the victim's parents, spoke with the victim, and verbally reprimanded the coach. *Id.* The purpose of these actions was to *interfere with* the alleged abuse, thereby mitigating the risk of continued constitutional injury. *Id.* Indeed, we distinguished the *Taylor* superintendent's

---

[4] This is especially true in light of A.M.'s prior complaints about Ariaz's conduct and the information Hanna obtained in the very early stages of his investigation regarding Whitley. Moreover, Hanna himself observed Whitley and Ariaz engaging in sexually suggestive behavior at the Brownwood Annex. Thus, there is no question that Hanna was aware of the risk to Whitley's constitutional rights.

[5] The majority opinion emphasizes that Hanna could have conducted the investigation differently by, for example, moving at a faster pace, or placing video cameras in the courtroom (rather than the public hallway) of the Brownwood Annex. But it concludes that such mistakes are not enough to plausibly support § 1983 liability. If Whitley's claim turned on arguably minor investigatory failures in a typical criminal investigation, I would agree wholeheartedly. But it does not. Rather, Whitley's allegations center on Hanna's deliberate choice to prolong the risk of constitutional injury for the perceived greater good of Ariaz's conviction.

actions from those of the deliberately-indifferent school principal, who "failed to take action that was obviously necessary to prevent or stop" the abuse.[6] *Id.* at 457. We focused on the principal's failure to take actions that may have "derailed the relationship." Put another way, the constitutional violations would not have been as "severe or prolonged" absent his deliberate choice not to act. *Id.* If the *Taylor* principal's nonfeasance is sufficient to show deliberate indifference, then Hanna's allegedly purposeful subrogation of Whitley's constitutional rights must be enough to survive 12(b)(6) dismissal.

The implicit message in the majority opinion's deliberate-indifference analysis is that an officer can escape § 1983 liability for a conscious endangerment of a victim's constitutional rights, provided that he acted with good intentions. For example, the majority opinion emphasizes that Hanna "had to decide what evidence would suffice to secure a conviction," and notes Hanna's commitment "to putting an end to Ariaz's abuses once and for all." But this ignores the fact that, in his zeal to put Ariaz behind bars for good, Hanna allowed—in fact, expected[7]—Whitley to suffer additional instances of sexual abuse at the hands of a fifty-five year old police officer. No matter how well-intended, investigatory and prosecutorial strategies must yield to the inviolable

---

[6] Moreover, the *Taylor* superintendent was new to the school, and had no prior knowledge of the teacher's behavior. Still, he acted immediately when he learned of the abuse. Here, on the other hand, Hanna declined to complete his investigation of A.M.'s complaint and then, after learning that Ariaz was likely abusing Whitley, decided to allow the abuse to continue.

[7] Indeed, Hanna's plan did more than just allow Ariaz to continue to abuse Whitley; rather, it required further acts of sexual abuse before Hanna would arrest Ariaz or directly intervene. For example, Whitley alleges that "[Hanna] observed Plaintiff sitting or lying on a table with Ariaz positioned over her in a clearly inappropriate and sexual manner" at or near 2:30 a.m. on July 17, 2013. The majority opinion's fine parsing of this allegation extends beyond the requirements of *Twombly* and *Iqbal*. Certainly, Hanna was aware of a substantial risk to Whitley's constitutional rights when he saw Ariaz positioned over Hanna in a "clearly inappropriate and sexual manner." Whitley alleges that, despite this known risk, Hanna allowed the contact to continue.

33

No. 12-10312

constitutional rights of those involved (typically the defendant, but here the victim).[8]   "While the difficulties of law enforcement are great, police investigations cannot be allowed to subordinate the rights of men and women under our Constitution.  This principle runs deep in our jurisprudence, and we will stand by it until time has tolled its last bell."  *Melear v. Spears*, 862 F.2d 1177, 1186–87 (5th Cir. 1989).

Moreover, the majority opinion's deliberate-indifference analysis suggests that Hanna faced a binary choice: arrest Ariaz, or do nothing to intervene in the absence of conclusive evidence of abuse.  *See, e.g.*, Op. at 16 ("Hanna had to decide what evidence would suffice to secure a conviction.").[9]  It focuses on the fact that Hanna had only "[v]ideo proof that [Whitley] was likely being abused,"

---

[8] As Whitley's counsel rightly noted at oral argument, there are many tactics that an officer could employ to secure stronger evidence in the course of an investigation: a coerced confession, an illegal search, an improper wiretap, and so on.  *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 69 (2004) (reversing the judgment of the Washington Supreme Court based on the unconstitutional denial of a defendant's Sixth Amendment right to confront a witness against him); *Kyles v. Whitley*, 514 U.S. 419, 454 (1995) (reversing a defendant's conviction and remanding for a new trial based on the state's unconstitutional failure to turn over exculpatory evidence); *Blackburn v. Alabama*, 361 U.S. 199, 211 (1960) (reversing a robbery conviction of a mentally incompetent defendant after his confession was found to be involuntary and in violation of the Fourteenth Amendment); *Giordenello v. United States*, 357 U.S. 480, 488 (1958) (reversing a conviction for the possession of narcotics when the arrest warrant lacked probable cause in violation of the Federal Rules of Criminal Procedure); *see also Wilson v. Lawrence Cnty.*, 260 F.3d 946 (8th Cir. 2001) (holding that a defendant could state a § 1983 claim where "a reasonable factfinder could determine that Defendants recklessly or intentionally chose to force Wilson to confess instead of attempting to solve the murder through reliable but time consuming investigatory techniques designed to confirm their suspicions," and noting that there is "no counterveiling equally important governmental interest that would excuse the appellants from fulfilling their responsibility").  We bar law enforcement from this conduct because, no matter how valuable the conviction, the constitutional rights at issue are paramount.  *See Blackburn,* 361 U.S. at 206 ("As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence.").

[9] *See also* Op. at 20 ("Thus, although we easily can imagine some alternatives to the choice that Appellees made—including confronting Whitley or contacting her parents—the fact remains that Appellees successfully brought about Ariaz's arrest approximately two weeks after Hanna first learned of a potential relationship between Ariaz and Whitley.").

34

which may not have been sufficient to obtain a conviction under the Texas Penal Code. But whether Hanna could or should have arrested Ariaz is an entirely different question from whether Hanna's failure to intervene in state-occasioned violence constitutes deliberate indifference. The deliberate-indifference standard requires only conscious disregard to a "*risk* that a violation of a particular constitutional right . . . will follow the decision." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411 (1997) (emphasis added) (analyzing the deliberate-indifference standard in the context of municipal liability, and evaluating whether a police officer's use of excessive force would have been a plainly obvious consequence of the sheriff's hiring decision). In other words, as soon as Hanna knew that Whitley was in danger of further sexual abuse, he could not choose to ignore the risk, regardless of whether he had direct evidence for a conviction.

In short, while Hanna may have preferred perfect proof of Ariaz's sexual abuse, video or eyewitness evidence was by no means a mandatory prerequisite to Whitley's rescue. I would hold at this preliminary stage that Hanna's alleged deliberate choice to prioritize Ariaz's eventual prosecution over Whitley's immediate safety plausibly constitutes deliberate indifference to a known risk of constitutional violations.

## IV.

Of course, the inquiry does not end with the plausibility of Whitley's § 1983 claim, as Hanna asserted a qualified-immunity defense. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).

Relevant here is the second prong of the inquiry: whether the constitutional right at issue was "clearly established" at the time of the

challenged conduct. *Id.* In considering this prong, the court asks whether the law so clearly and unambiguously prohibited his conduct that "every 'reasonable official would understand that what he is doing violates [the law].'" *Id.* at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The court will not deny immunity unless "existing precedent . . . placed the statutory or constitutional question beyond debate." *Id.* at 2083. This doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The "clearly established" requirement does not depend on the existence of a case directly on point, however. *See al-Kidd*, 131 S. Ct. at 2083; *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) ("To be established clearly, however, there is no need that the 'very action in question [have] previously been held unlawful.'" (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999))). "Rather, '[t]he central concept is that of fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Morgan v. Swanson*, 659 F.3d 359, 412–13 (5th Cir. 2011) (en banc) (Elrod, J., dissenting) (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)) (internal quotation marks omitted). The fair notice requirement is satisfied if controlling authority—or a "robust 'consensus of persuasive authority'"—defines the contours of the right in question with a high degree of particularity. *See al-Kidd*, 131 S. Ct. at 2083 (quoting *Wilson*, 526 U.S. at 617).

Here, I would hold that Hanna lacked fair notice that his conduct would amount to a constitutional violation.[10] Although there is no debate that a child

---

[10] The court looks not to whether the underlying constitutional violation is clearly established, but rather to whether an officer would have known that his conduct in

has an inviolable right to bodily integrity, *see supra* Part II, our case law regarding an individual's obligation to intervene in incidents of child sexual abuse arises almost exclusively in the context of school officials. *See Taylor*, 15 F.3d at 450–51; *Rains*, 66 F.3d at 1413. The other analogous body of law arises in bystander-liability cases, in which we require both actual presence at and acquiescence in the underlying constitutional violation. *See Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995). There simply is not enough controlling or persuasive authority to conclude that every reasonable official in Hanna's position would understand that what he was doing violated the law. For that reason, Hanna is entitled to qualified immunity.

## V.

This case is about a state actor's knowing, deliberate choice not to intervene despite a substantial risk of continued statutory rape by a public official, in hopes of obtaining direct evidence for a conviction. While the underlying law-enforcement goal may be laudable, it must bend where a constitutional right is in play. Therefore, I would hold that Whitley states a plausible deliberate-indifference claim under § 1983. Nevertheless, I concur in the judgment because Hanna is entitled to qualified immunity.

---

addressing—or failing to address—the underlying violation, in and of itself, creates a constitutional injury. *See, e.g.*, *al-Kidd*, 131 S. Ct. at 2084 (explaining that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established" (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Wilson*, 526 U.S. at 615)).